# United States Court of Appeals
## For the First Circuit

No. 01-2586

KUNWAR S. P. SINGH, M.D.

Plaintiff, Appellant,

v.

BLUE CROSS/BLUE SHIELD OF MASSACHUSETTS, INC. AND BENJAMIN W.
WHITE, M.D.,

Defendants, Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris Lasker, District Judge]

Before

Torruella and Lipez, <u>Circuit Judges</u>, and
McAuliffe, <u>District Judge</u>*

<u>William A. Curry</u> for appellant.
<u>Nicholas J. Nesgos</u>, with whom <u>Posternak, Blankstein &
Lund, LLP</u> was on brief, for appellees.

August 27, 2002

_____

*Of the District of New Hampshire, sitting by designation.

**LIPEZ, Circuit Judge**.  In a case of first impression in this circuit, we must review the application of the Health Care Quality Immunity Act (HCQIA), 42 U.S.C. §§ 11101-11152, to the contention of Dr. Kunwar Singh that defendants Blue Cross/Blue Shield of Massachusetts, Inc. ("Blue Cross") and Dr. Benjamin White (as Blue Cross's auditor) violated Dr. Singh's rights in numerous ways during their review of his treatment record.  Blue Cross and Dr. White counter that in actions stemming from such peer reviews, HCQIA provides immunity from liability for money damages.  After analyzing the summary judgment record, we conclude that Dr. Singh could not establish before a reasonable jury that Blue Cross was not entitled to HCQIA immunity, thereby precluding his recovery of damages.  Dr. Singh's claims also fail on the merits, thereby precluding any relief.  Thus we affirm the district court's grant of summary judgment to Blue Cross and Dr. White.

## I. Background

We describe the background of the case here, adding more detail below as it becomes relevant to the legal analysis.  Since we are reviewing the grant of a motion for summary judgment, we view the facts "in the light most favorable to the nonmovant." Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002).

Dr. Singh is a physician specializing in internal medicine.  Before 1992, he provided health care for members of the Bay State Health Care, Inc. ("Baystate") and Blue Cross insurance plans.  Dr. Singh provided services for two types of patients insured by Blue Cross: those insured under HMO Blue, a managed care

plan, and those insured under traditional fee-for-service or "indemnity" plans.

After Baystate merged with Blue Cross in 1992, Blue Cross offered a "Bay State Health Care" line of coverage to former Bay State subscribers. Blue Cross denied several physicians participation in the Bay State Healthcare Network "due to utilization review reasons." According to a letter sent on September 30, 1993, by Susan Gretkowski of Blue Cross's legal department, Dr. Singh "was denied participation because of excessive utilization rates[1] in the former Bay State Health Care." Gretkowski's letter explained:

> The former Medical Director of Bay State Health Care . . . met with Dr. Singh on July 29, 1992 to discuss the excessive utilization rates. Bay State then began an investigation of Dr. Singh's practice, but the investigation was never completed. Blue Cross and Blue Shield offers at this time to complete that audit, and then re-evaluate Dr. Singh's practice based on the results of that audit.

Dr. Singh and Blue Cross then negotiated the terms and scope of the audit. According to an Audit Agreement signed by both parties on October 10, 1994, Blue Cross agreed to "consider admitting [Dr. Singh] into its Bay State Product if the results of the audit [were] positive." In return for this opportunity, Dr. Singh also released Blue Cross and its employees from liability for claims arising out of the audit.

---

[1] Although the term is not explicitly defined in the record, we assume that "utilization rate" simply refers to the amount of health care services consumed by Dr. Singh's patients and authorized by Dr. Singh.

The Agreement set forth a procedure for conducting the audit. First, Blue Cross would randomly select twenty-five patients from Dr. Singh's HMO Blue practice. Next, Dr. Singh was to turn over both the medical and the claims files of these patients. Within fifteen days after Blue Cross received the relevant records from Dr. Singh, both parties were to select a mutually acceptable peer reviewer. After he or she received the records, the reviewer would then have sixty days to evaluate them. Blue Cross promised to offer Dr. Singh a "one year non-self renewing contract" if the review was positive.

The parties initially could not agree on a peer reviewer, with Dr. Singh refusing to accept any of the physicians nominated by Blue Cross. Although the physician nominated by Dr. Singh worked at the same hospital as Dr. Singh, Blue Cross agreed to permit him to conduct the review. However, when that physician received the relevant paperwork, he decided not to conduct the review. After Dr. Singh failed to respond to Blue Cross's request that he nominate another physician, Blue Cross appointed Dr. Walter Clayton to perform the review.[2]

Dr. Clayton's review (the "first audit") was based on the random sample of twenty-five of Dr. Singh's patient files from 1992-1994. Dr. Clayton found an "excessive use of pain medication for chronic problems." Dr. Clayton also identified unduly lengthy

---

[2] While Blue Cross was arranging for this review, it also sent a letter dated June 13, 1994, notifying Dr. Singh that he would be terminated as a Blue Cross provider. Blue Cross admitted that this letter was sent erroneously. It was never implemented.

regimens of antibiotic treatment and overutilization of lab tests and office visits. Dr. Clayton concluded his report with some positive remarks, praising Dr. Singh's careful treatment of low-income patients and his holistic approach to diagnosis. However, Dr. Clayton indicated that the "documented treatment showed evidence of care somewhat below the recognized standard of care."

On the basis of Dr. Clayton's findings, the five members of the Blue Cross Remedial Action Committee ("RAC"), all physicians, decided that Dr. Singh should not be offered a Baystate contract and that there should be a second audit to determine whether Dr. Singh was fit to continue as a provider in Blue Cross's HMO Blue and indemnity plans. Pending the results of the audit, to be conducted by Dr. Benjamin W. White, the RAC also recommended that Blue Cross "freeze" Dr. Singh's "HMO Blue panel"--that is, prevent him from accepting new HMO Blue patients. Blue Cross did not implement that last recommendation, even though the RAC never voted to rescind it.

Dr. White's review (the "second audit") concentrated on patients to whom Dr. Singh had prescribed narcotics. Joan Downey, Peer Review Coordinator at Blue Cross, requested records from Dr. Singh's office for cases from January 1, 1995 to mid-1996. The RAC ordered her to include all of the patient files which contained prescriptions for narcotics. Twenty-one of the ninety-seven did so. Downey also included a random selection of sixteen of the remaining seventy-six patient files, forwarding a total of thirty-seven patient files for Dr. White's review.

Dr. White's audit was much more critical of Dr. Singh than Dr. Clayton's audit. Dr. White concluded that "[c]ompetent expert care is rarely seen;" he found substandard care in thirty-three of the thirty-seven cases that he reviewed. However, the second audit contained two flaws. First, Dr. White assumed incorrectly that the patient files were selected randomly. Downey failed to inform him that the RAC ordered her to include all the files of patients to whom Dr. Singh had prescribed narcotics in the sample. In addition, Blue Cross included four patients who were not patients of Dr. Singh, all of whom were prescribed narcotics, and were included in Dr. White's list of patients to whom Dr. Singh gave substandard care.

Through Joan Downey of Blue Cross, Dr. White submitted two documents to the RAC: a letter identifying broad areas of concern with Dr. Singh's practice, and a "special report" detailing Dr. White's concerns about particular cases handled by Dr. Singh. He insists that he did not discuss the report with anyone else. The RAC considered both documents on September 12, 1996, and reviewed approximately fifteen of the thirty-seven patient files reviewed by Dr. White. After discussing the matter, the RAC unanimously recommended termination of Dr. Singh's participation in all Blue Cross plans.

In a letter from Blue Cross notifying Dr. Singh of the termination decision on October 16, 1996, he was advised that he would be afforded a "fair hearing" review of the decision if he requested one by a certain deadline. Dr. Singh did so, and Blue

Cross accordingly refrained from acting on the RAC's vote pending the decision of the Fair Hearing Panel. This panel, consisting of two independent physicians and one attorney, held hearings on five days between June and December, 1997. At their conclusion, the Panel reversed the RAC's recommendation to terminate Dr. Singh, and Blue Cross did not take any further action against him. Thus, Dr. Singh's indemnity and HMO contracts were never terminated by Blue Cross.

Dr. Singh brought this action in federal court against Blue Cross in 1998 for harm resulting from the peer review process, alleging defamation, tortious interference with advantageous business relations, breach of contract and violation of Mass. Gen. Laws ch. 93A. In addition, he filed suit against Dr. White for defamation.

Blue Cross and Dr. White moved for summary judgment, arguing that the HCQIA and the Massachusetts Peer Review Statute (Mass. Gen. Laws ch. 111, § 203(c)) immunize them from liability for damages stemming from Blue Cross's peer review process. They also argued that, even if they were not eligible for such immunity, Dr. Singh could not prevail on the merits. Granting summary judgment, the district court agreed with the defendants on their immunity and merits arguments. We review the grant of summary judgment de novo.

## II. Blue Cross's Immunity Under the HCQIA

### A. The HCQIA

When Congress passed the HCQIA in 1986, it was responding to a crisis in the monitoring of health care professionals. Although state licensing boards had long monitored the conduct and competence of their own health care workers, Congress found that "[t]he increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State." 42 U.S.C. § 11101(1). Finding that incompetent "physicians find it all to[o] easy to move to different hospitals or states and continue their practices in these new locations," Congress mandated the creation of a national database that recorded incidents of malpractice and that was available for all health care entities to review when screening potential employees. H.R.Rep. No. 99-903, at 2, reprinted in 1986 U.S.C.C.A.N. 6384, 6385 (hereinafter "H.R.Rep. No. 99-903").[3] Before passage of the HCQIA in 1986, threats of antitrust action and other lawsuits often deterred health care entities from conducting effective peer review. In order to encourage the type of peer review that would expose incompetent physicians, the HCQIA shields health care entities and individual physicians from

---

[3] This committee report refers to a bill that was slightly different than the law that was ultimately passed as the HCQIA. We nevertheless refer to it because the language of the bill that it addressed was close to that of the HCQIA, and all other circuit courts addressing the legislative history of the HCQIA have primarily referred to this report.

liability for damages for actions performed in the course of monitoring the competence of health care personnel.[4]  See Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 632 (3d Cir. 1996) (describing legislative history of the HCQIA); Bryan v. Jane E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1332 (11th Cir. 1994) (listing Congressional motivations for passing the HCQIA).

The HCQIA mandates that a health care entity's review of the competence of a physician shall not result in its liability "in damages under any law of the United States or of any State," if such a peer review "meets all the standards specified in section 11112(a) of this title."  42 U.S.C. § 11111(a).  In order for immunity to attach to a professional review action, it

> must be taken--
> (1) in the reasonable belief that the action was in the furtherance of quality health care,
> (2) after a reasonable effort to obtain the facts of the matter,
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a).  The HCQIA standards "will be satisfied if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded

---

[4]  The term "health care entity" includes any "entity (including a health maintenance organization or group medical practice) that provides health care services and that follows a formal peer review process for the purpose of furthering quality health care."  42 U.S.C. § 11151(4)(A)(ii).

that their action would restrict incompetent behavior or would protect patients." H.R. Rep. No. 99-903 at 10, reprinted in 1986 U.S.C.C.A.N. 6384, 6392-93 (discussing the proper test to use in applying the first HCQIA standard). Adopting "objective 'reasonable belief' standard[s]," the HCQIA advances the Congressional purpose of permitting a determination of immunity without extensive inquiry into the state of mind of peer reviewers. Id. at 12 (stating that "these provisions [are designed to] allow defendants to file motions to resolve the issue of immunity in as expeditious a manner as possible").

Our sister circuits have uniformly applied all the sections of § 11112(a) as objective standards. See Mathews, 87 F.3d at 635 (collecting cases); Imperial v. Suburban Hosp. Ass'n, Inc., 37 F.3d 1026, 1030 (4th Cir. 1994) ("The standard is an objective one which looks to the totality of the circumstances."); Smith v. Ricks, 31 F.3d 1478, 1485 (9th Cir. 1994) ("the 'reasonableness' requirements of § 11112(a) were intended to create an objective standard, rather than a subjective standard"); Bryan, 33 F.3d at 1335 ("The test is an objective one, so bad faith is immaterial. The real issue is the sufficiency of the basis for the [Hospital's] actions."); Austin, 979 F.2d 728, 734 (9th Cir. 1992); but see id., 979 F.2d at 741 n.3 (Pregerson, J., dissenting) ("Evidence of motive and intent is relevant to show whether the defendants possessed a reasonable belief that [an adverse professional review action] was warranted by the facts known."). We apply these objective standards here.

-10-

## B. Summary Judgment Under the HCQIA

The statute establishes a rebuttable presumption that immunity attaches to a professional review action: "[a] professional review action shall be presumed to have met the [four HCQIA] standards . . . unless the presumption is rebutted by a preponderance of the evidence." 42 U.S.C. § 11112(a). In considering the defendants' motions for summary judgment based on HCQIA immunity, we ask the following: "[m]ight a reasonable jury, viewing the facts in the best light for [Dr. Singh], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?" Austin, 979 F.2d at 734 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986)); see also Bryan, 33 F.3d at 1333 (quoting this language from Austin). Therefore, Dr. Singh can overcome HCQIA immunity at the summary judgment stage only if he demonstrates that a reasonable jury could find that the defendants did not conduct the relevant peer review actions in accordance with one of the HCQIA standards.

Dr. Singh suggests that the statutory presumption of immunity effectively denies him his Seventh Amendment right to a jury trial. However, Dr. Singh misconstrues the significance of the statutory presumption in the context of summary judgment. Dr. Singh's burden is no different than that of the nonmovant who must demonstrate the existence of a genuine issue as to any material fact on all of the elements of the claim alleged once a movant for summary judgment files a properly supported motion. See Anderson,

-11-

477 U.S. at 254 ("The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict."); see also William W. Schwarzer, Alan Hirsch, and David J. Barrans, The Analysis and Decision of Summary Judgment Motions 47 (1991) (describing further the burden on the nonmoving party once a party moving for summary judgment points out to the district court that there is an absence of evidence to support the nonmoving party's case). With the benefit of the statutory presumption, the nonmovant is relieved of the initial burden of providing evidentiary support for its contention at summary judgment that there is no genuine issue of material fact on its compliance with the HCQIA standards.[5] For Dr. Singh, however, the burden of defeating summary judgment remains similar to the burden faced by any plaintiff confronted with a properly supported motion for summary judgment.[6] Summary judgment would not be proper

---

[5] Since HCQIA immunity may only be overcome by a preponderance of the evidence, the statutory presumption in favor of the health care entity shifts to the plaintiff "not only the burden of producing evidence but the burden of persuasion as well." See Jerome A. Hoffman, Thinking About Presumptions: The Presumption of Agency from Ownership as Study Specimen, 48 Ala. L. Rev. 885, 896-97 (1997) (examining the "Thayer-Wigmore effect" and the "Morgan effect" of presumptions). Of course, a defendant moving for summary judgment on the basis of HCQIA immunity can choose to submit evidentiary material in support of its motion instead of relying solely on the evidentiary weight of the statutory presumption. That is a choice for the litigant.

[6] The summary judgment procedure essentially "prescribes the means of making an issue. The issue made as prescribed, the right of trial by jury accrues." Fidelity & Deposit Co. of Md. v. United States, 187 U.S. 315, 320 (1902). The statutory presumption at issue here simply adds another element to the plaintiff's case, and hence another issue to be "made as prescribed [before] the right of

if Dr. Singh raised a genuine issue of fact material to the determination of whether Blue Cross met one of the HCQIA standards during its peer review. Therefore, the statute does not unconstitutionally deny Dr. Singh his right to a jury trial.

Dr. Singh also argues that the district court denied him his right to a jury trial through improper application of the summary judgment standard--namely, by resolving against him the reasonableness issues under the HCQIA that should have been resolved by a jury. It is true, as our formulation here of the summary judgment question suggests (asking whether a reasonable jury could find that a defendant did not meet one of the standards for HCQIA immunity), that the statutory scheme contemplates a role for the jury, in an appropriate case, in deciding whether a defendant is entitled to HCQIA immunity. The weight of authority from our sister circuits reflects this proposition. See Gabaldoni v. Washington Cty. Hosp., 250 F.3d 255, 260 (4th Cir. 2001) ("Due to the presumption of immunity contained in section 11112(a), we must apply an unconventional standard in determining whether [the health care entity] was entitled to summary judgment--whether a reasonable jury, viewing all facts in a light most favorable to [the plaintiff], could conclude that he had shown, by a preponderance of the evidence, that [the health care entity's] actions fell outside the scope of section 11112(a)."); Sugarbaker v. SSM Health Care, 190 F.3d 905, 912 (8th Cir. 1999); Brader v. Allegheny Gen. Hosp. 167 F.3d 832, 839 (3d Cir. 1999); Brown v.

trial by jury accrues." Id.

-13-

Presbyterian Healthcare Servs., 101 F.3d 1324, 1334 n.9 (10th Cir. 1992) (determining whether the plaintiff "provided sufficient evidence to permit a jury to find she has overcome, by a preponderance of the evidence, any of the four statutory elements required for immunity under 42 U.S.C. § 11112(a)"); Austin, 979 F.2d at 734; Bryan, 33 F.3d at 1333. This jury involvement is not limited to disputes over subsidiary issues of fact.[7] Rather, a jury could be asked to decide the ultimate issues of reasonableness set forth in the immunity statute.

---

[7] Bryan states that "HCQIA immunity is a question of law for the court to decide" and limits jury involvement to settling "disputed subsidiary issues of fact." Bryan, 33 F.3d at 1332-33. However, Bryan's articulation of the summary judgment standard follows the other circuits in contemplating a role for the jury in the ultimate determination of HCQIA immunity:

> . . . the rebuttable presumption of HCQIA section 11112(a) creates an unusual summary judgment standard that can best be expressed as follows: "Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?"

Id. at 1333 (quoting Austin, 979 F.2d at 734). Moreover, the only example Bryan gives of a "disputed subsidiary issue[] of fact" is a HCQIA immunity determination itself: "If there are disputed subsidiary issues of fact concerning HCQIA immunity, such as whether the disciplined physician was given adequate notice of the charges and the appropriate opportunity to be heard, the court may ask the jury to resolve the subsidiary factual questions by responding to special interrogatories." Id. (emphasis added) (citations omitted). This query is almost identical to the third HCQIA standard. See 42 U.S.C. 11112(a)(3) (denying immunity if peer review board fails to give physician "adequate notice and hearing procedures"). Given Bryan's internal inconsistency, and its contradiction of the other circuits' holding that a jury may in principle make a HCQIA immunity determination, we decline to adopt its designation of HCQIA immunity determinations as pure questions of law off limits to a jury.

In this allocation of responsibility between judge and jury, there is an important difference between qualified immunity under the HCQIA and qualified immunity under 42 U.S.C. § 1983.[8] Qualified immunity determinations under § 1983 are "question[s] of law, subject to resolution by the judge not the jury," Prokey v. Watkins, 942 F.2d 67, 73 (1st Cir. 1991),[9] while HCQIA immunity determinations may be resolved by a jury if they cannot be resolved at the summary judgment stage. This distinction is appropriate because qualified immunity analysis under § 1983 involves a

---

[8]   Section 1983, originally § 1 of the Ku Klux Klan Act of 1871, "creates an action for damages and injunctive relief for the benefit of citizens and other persons against those persons responsible for the violation" of "certain rights secured by the Constitution and laws." 1 Sheldon Nahmod, Civil Rights and Civil Liberties Litigation § 1:1 (4th ed. 2001) (internal quotation marks and citations omitted). Courts and commentators have analogized HCQIA and § 1983 immunity. See, e.g., Fobbs v. Holy Cross Health Sys. Corp., 789 F. Supp. 1054, 1063-65 (E.D. Cal. 1992) (analogizing HCQIA immunity and § 1983 immunity); see also Susan L. Horner, The Health Care Quality Improvement Act of 1986: Its History, Provisions, Applications and Implications, 16 Am. J.L. & Med. 455, 467 (1990) (characterizing HCQIA immunity as a "qualified immunity").

[9] Several courts have indicated that if factual disputes underlie a qualified immunity determination, a judge may issue "special interrogatories to the jury as to the disputes of fact." St. Hilaire v. City of Laconia, 71 F.3d 20, 24 n. 1 (collecting cases). Though we have not explicitly adopted this approach, id., we have expressed approval of it:

> [T]he Supreme Court has not clearly indicated whether the judge may act as fact-finder when there is a factual dispute underlying the qualified immunity defense or whether this function must be fulfilled by a jury. In any event, when facts are in dispute, "'we doubt the Supreme Court intended this dispute to be resolved from the bench by fiat.'"

Kelley v. LaForce, 288 F.3d 1, 7 (1st Cir. 2002) (quoting St. Hilaire, 71 F.3d at 24 n.1 (quoting Prokey, 942 F.2d at 72)).

-15-

quintessential legal question:  whether the rights at issue are clearly established.  See Anderson v. Creighton, 483 U.S. 635, 638 (1987)  (explaining that "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken" (internal quotation marks and citations omitted)).  There is no comparable legal question involved in the immunity analysis under the HCQIA.  Moreover, immunity under the HCQIA is immunity from damages only, whereas qualified immunity under § 1983 is "an immunity from suit rather than a mere defense to liability [that] is effectively lost if a case is erroneously permitted to go to trial."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  Hence, there is less reason under the HCQIA to exclude the jury entirely from involvement with the dispositive determinations.

Also, the Supreme Court has suggested a helpful functional approach in deciding the proper allocation of functions between judge and jury:

> At least in those instances in which Congress has not spoken and in which the issue falls somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another  to decide the issue in question.

Miller v. Fenton, 474 U.S. 104, 114 (1985).  Such a "functional inquiry involves several factors, including whether the issue falls

-16-

within the common experience of jurors, whether its resolution involves the kinds of decisions traditionally entrusted to jurors, and whether a judgment of peers is desirable." William W. Schwarzer, Alan Hirsch, and David J. Barrans, The Analysis and Decision of Summary Judgment Motions 18-19 (1991) (reprinted at 139 F.R.D. 441). Although peer review actions are not within the common experience of jurors, they are not so esoteric that they cannot be fairly evaluated by jurors, perhaps with the assistance of expert witnesses. Also, we routinely ask jurors to evaluate the quality of medical care in medical malpractice cases. As this case illustrates, the quality of medical care is often at the core of a peer review dispute under the HCQIA. Therefore, we see no reason why juries should be excluded entirely from immunity determinations under the HCQIA.

However, Congress unmistakably recognized the usefulness of summary judgment proceedings in resolving immunity issues under the HCQIA prior to trial. Again, the comparison to qualified immunity under § 1983 is instructive. As already noted, pursuant to Supreme Court precedents, a state official is immune from suit under § 1983 when his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citations omitted). By "defining the limits of qualified immunity essentially in objective terms," the Supreme Court has indicated that this "defense would turn primarily on objective factors," and would therefore be amenable to resolution at the summary judgment

-17-

stage, when judges could determine whether the rights at issue in the case were "clearly established" at the time of the alleged offense.  Id. at 819, 820.  The Supreme Court has repeatedly emphasized that the qualified immunity determination should be made as soon as possible during the course of litigation.  See id. at 815-16 (referring to the Court's holding in Butz v. Economou, 438 U.S. 478, 508 (1978), that "insubstantial claims should not proceed to trial").  Like the Supreme Court in Harlow, Congress indicated in the legislative history of the HCQIA that its immunity determinations should also be made expeditiously.  See H.R. Rep. No. 99-903, at 12, reprinted in 1986 U.S.C.C.A.N. 6384, 6394 (stating that "these provisions [are intended to] allow defendants to file motions to resolve the issue of immunity in as expeditious a manner as possible," and anticipating that courts would "determine at an early stage of litigation that the defendant has met the [section 11112(a)] standards").

In asserting that the district court deprived him of his right to a jury trial with its summary judgment ruling, Dr. Singh overlooks the import of Congress's adoption of objective standards for the HCQIA immunity determination.  Given the objective standards set forth in the statute, reasonableness determinations under the HCQIA may often become legal determinations appropriate for resolution by the judge at summary judgment.  If there are no genuine disputes over material historical facts,[10] and if the

_____

[10] As a monograph on the topic explains, "[a] historical fact is a thing done, an action performed, or an event or occurrence. . . . A dispute over historical facts or inferences, if

-18-

evidence of reasonableness within the meaning of the HCQIA is so one-sided that no reasonable jury could find that the defendant health care entity failed to meet the HCQIA standards, the entry of summary judgment does no violence to the plaintiff's right to a jury trial. With these considerations in mind, we turn to the summary judgment record.

## C. The Professional Review Actions Challenged By Dr. Singh

There are many elements of a peer review, including investigation, deliberation, recommended actions and final decisions. The HCQIA addresses professional review actions. A professional review action is defined in the HCQIA as:

> an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.

42 U.S.C. § 11151(9). Professional review activities are generally precursors to professional review actions. Professional review activities include a health care entity's efforts

---

genuine and material within the meaning of [Federal] Rule [of Civil Procedure] 56, precludes summary judgment." Schwarzer et al., supra, at 14.

-19-

> (A) to determine whether the physician may
> have clinical privileges with respect to, or
> membership in, the entity,
> (B) to determine the scope or conditions of
> such privileges or membership, or
> (C) to change or modify such privileges or
> membership.

42 U.S.C. § 11151(10). When a court considers whether a health care entity is immune from damages for a given professional review action, it considers whether that action, considered as a whole, and including all the professional review activities relating to it, meets the standards set forth in § 11112(a).

The district court determined that Blue Cross took three professional review actions with respect to Dr. Singh. As a result of the first audit, Blue Cross (1) decided not to permit Dr. Singh to become a provider for the Baystate Line, and (2) decided to "freeze" his HMO Blue patient panel. As a result of the second audit, Blue Cross (3) terminated Dr. Singh as a Blue Cross provider.[11]

---

[11] In his opposition to Blue Cross's motion for summary judgment, Dr. Singh contended that Blue Cross took "professional review actions" in addition to those listed above, including (1) entering the 1994 Audit Agreement; (2) deciding to conduct a second audit; (3) notifying Dr. Singh's Bay State patients that he was no longer a Bay State provider; and (4) sending a letter dated June 13, 1995, notifying Dr. Singh that he would be terminated as a Blue Cross provider. The district court concluded that these events are all more properly considered professional review activities, and Dr. Singh does not challenge this determination on appeal.

**D. Applying the HCQIA Standards**

Since Dr. Singh argues that Blue Cross failed to meet all of the HCQIA standards in each of the two audits it conducted, we examine each in turn.

**1. The First Audit**

Dr. Singh argues that the RAC's refusal to admit him to the Baystate Line and its recommendation that his Blue Cross patient panel be frozen were not in accordance with HCQIA standards.[12] With these contentions in mind, we review the record to determine whether a reasonable jury could determine that Dr. Singh overcame the statutory presumption that Blue Cross performed these professional review actions in accordance with the strictures of § 11112(a):

> (1) in the reasonable belief that the action[s were] in the furtherance of quality health care,
> (2) after a reasonable effort to obtain the facts of the matter,

_____

[12] According to an Audit Agreement signed by both parties on October 10, 1994, Blue Cross agreed to "consider admitting [Dr. Singh] into its Bay State product if the results of the [first] audit [were] positive." In return for this opportunity, Dr. Singh released Blue Cross and its employees from liability for claims arising out of the audit, except for "any claim Dr. Singh may have regarding the conduct of the audit itself or any willful failure to comply with this Agreement." The district court did not consider whether Dr. Singh had waived his right to sue with respect to the decision to freeze his patient panel, but did hold that the audit agreement prevented Dr. Singh from suing Blue Cross for its denial of his admission to the Baystate line. Despite this holding, the district court went on to consider whether Blue Cross earned HCQIA immunity with respect to both of the professional review actions arising out of the first audit. Given the ambiguity of the audit agreement and the failure of both parties to address this waiver issue, we think it advisable to follow this course as well.

(3) after adequate notice and hearing procedures [were] afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action[s were] warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. 11112(a). We follow the district court's thoughtful opinion and consider these two professional review actions in tandem because they both resulted from the first audit of Dr. Singh, conducted by Dr. Clayton.

## a. In furtherance of quality health care and warranted by facts known[13]

The RAC decided to freeze Dr. Singh's patient panel and to deny him admission to the Baystate product line because of Dr. Clayton's audit. Dr. Singh claims that Blue Cross could not have reasonably believed that these actions would further quality health care and were warranted by the facts known.

First, Dr. Singh argues that, in some other cases where a health care entity was granted immunity, the health care entity only disciplined a physician in response to demonstrated harm to patients, or took less drastic measures than those recommended for Dr. Singh before opting to discipline the physician. See Gabaldoni v. Wash. Cty. Hosp. Ass'n, 250 F.3d 255, 261 (4th Cir. 2001) (granting immunity where plaintiff physician had been subject to

---

[13] Following the lead of our sister circuits, we evaluate together standards (1) and (4) of HCQIA immunity. As their wording suggests, they are closely related.

-22-

multiple lawsuits); Egan v. Athol Mem'l Hosp., 971 F. Supp. 37, 41, 44 (D. Mass. 1997) (granting immunity where defendants repeatedly received complaints from staff and plaintiff was required to complete courses); Mathews, 87 F.3d at 628, 629 (immunity granted where plaintiff physician injured patient with high speed drill). Dr. Singh essentially argues that the RAC could only have reasonably believed that professional review actions adverse to him would further quality health care if it was responding to documented patient injuries or if it prefaced its decisions to freeze his patient panel and deny him entry to the Baystate plan with other, less severe "reeducation" measures.

Neither position comports with the purpose of the HCQIA, or precedent interpreting it. The HCQIA was designed to prevent patient harm, not to assure an adequate response after it occurred. See 42 U.S.C. § 11101(a) (describing Congressional finding that peer review was necessary in order to keep "incompetent physicians" from harming patients). Therefore, Blue Cross was under no obligation to wait until a patient was actually harmed by Dr. Singh before it took preventive action limiting his access to Blue Cross customers and further investigating his practice. Blue Cross's failure to "reeducate" Dr. Singh also does not demonstrate that the RAC could not have "reasonably . . . concluded that [its] actions would restrict incompetent behavior or would protect patients." H.R. Rep. No. 99-903 at 10, reprinted in 1986 U.S.C.C.A.N. 6384, 6392-93 (discussing the proper test to use in applying the first

HCQIA standard).  The RAC suspected that Singh could harm patients, and therefore restricted his access to them.  Dr. Singh cites no authority for the proposition that Blue Cross was obliged to take the response least disruptive to Dr. Singh upon receiving evidence that his practices did not comply with the relevant standards of care.

Dr. Singh also argues that Blue Cross could not have reasonably believed that its professional review actions would further quality health care because Dr. Clayton's audit was not entirely critical.  Dr. Clayton observed in his audit report that Singh "appear[ed] to make a sincere effort to try to deal with . . . multiple problems which are at the most challenging and at the very least many times difficult to attain satisfactory conclusions."  However, Dr. Clayton also stated that Singh's "documented treatment showed evidence of care somewhat below recognized standards of care."  Dr. Clayton's praise for Dr. Singh's apparent good faith effort to help his patients does not so vitiate the negative aspects of his audit as to discredit Blue Cross's decision to base its adverse professional review actions on the Clayton audit.

Finally, Dr. Singh claims that Blue Cross took its professional review actions "not because of quality of care issues, but because his practice was not cost efficient."  He also notes that the first audit "in part focused on over utilization of office visits and lab tests."  Noting that almost all other HCQIA cases

-24-

involved hospitals, "providers of health care," Dr. Singh argues that "it could reasonably be inferred that Blue Cross's primary concern was not to further quality health care, but to provide health care insurance to its members at a profit."

Dr. Singh offers a false dichotomy between furthering quality health care and overutilization of medical procedures and tests. If patients are being subjected to unnecessary procedures and tests, the consequences are both economic and medical. Dr. Singh offers no evidence that Blue Cross's RAC was acting only as a cost-cutting body when it reviewed his performance. The Clayton audit focused on health care concerns. Like the plaintiff physician who failed to overcome the statutory presumption of immunity in Mathews, Dr. Singh

> has produced no evidence that [economic] considerations actually entered into the [RAC]'s decisionmaking process. . . . Rather, Dr. [Singh] appears to base his argument solely on his allegation that the defendants . . . stood to gain by eliminating him . . . .

Mathews, 87 F.3d at 636. Although Dr. Clayton's audit did refer to a pattern of overutilization of medical resources in Dr. Singh's practices--including excessive and inappropriate lab tests, too-frequent office visits, and overly long treatment regimens of antibiotics--all of these criticisms are inextricably intertwined with medical concerns. No reasonable jury could conclude that the RAC's actions were not taken in the reasonable belief that its

actions were warranted by the facts known from the Clayton audit to further quality health care.

## b. Reasonable Investigation

For HCQIA immunity to attach to a professional review action, the decision must be taken "after a reasonable effort to obtain the facts of the matter." 42 U.S.C. § 11112(a)(2). Dr. Singh's only challenge to the statutory presumption that Blue Cross acted in accordance with this standard while conducting the first audit is his assertion that "the RAC focused on all of the patient files containing narcotic prescriptions even though Clayton's three-page report barely mentioned Singh's narcotic prescription practices." Even if we assume arguendo that the RAC did focus on patient files containing narcotic prescriptions, and was wrong to do so, those mistakes relate to the RAC's interpretation of the facts--not its "effort to obtain the facts." Id. Blue Cross hired an independent auditor, Dr. Clayton, to conduct the first audit, which was based on twenty-five randomly selected patient files. The RAC carefully reviewed Clayton's report. Given these steps, no reasonable jury could find that Blue Cross failed to take its professional review action "after a reasonable effort to obtain the facts of the matter." Id.

## c. Adequate Notice and Procedures

A professional review action must be taken "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to

-26-

the physician under the circumstances." 42 U.S.C. § 11112(a)(3). The controlling question is whether the plaintiff "has shown by a preponderance of the evidence, that the defendant[] did not provide him with fair and adequate process under the circumstances." Islami v. Covenant Med. Ctr. Inc., 822 F. Supp. 1361, 1377 (N.D. Iowa 1992).

Dr. Singh alleges that the first audit was not fair because "Blue Cross did not select a mutually agreeable peer review consultant as required under the Audit Agreement." However, the record demonstrates that Dr. Singh was largely responsible for this state of affairs. The parties initially could not agree on a peer reviewer, with Dr. Singh refusing to accept any of the physicians nominated by Blue Cross. Although the physician nominated by Dr. Singh (Dr. Criss) worked at the same hospital as Dr. Singh, Blue Cross agreed to permit him to conduct the review. However, when that physician received the relevant paperwork, he decided not to conduct the review. After Dr. Singh failed to respond to Blue Cross's request that he nominate another physician, Blue Cross appointed Dr. Clayton to perform the review. Therefore, Dr. Singh was at least as responsible for the "unfair" appointment of Dr. Clayton as was Blue Cross. Dr. Singh cannot claim that Blue Cross's failure to appoint a "mutually agreeable" peer reviewer made the first audit unfair when his failure to cooperate with Blue Cross led to this result.

Dr. Singh also claims that Blue Cross should have permitted him to discuss Dr. Clayton's audit with Dr. Clayton before the RAC voted to deny Singh participation in the Baystate product line and to freeze Dr. Singh's patient panel. However, the HCQIA procedural standard does not require peer review bodies to guarantee the "accused" such a procedural safeguard. "[N]othing in the Act requires that a physician be permitted to participate in the review of his care." Sklaroff v. Allegheny Health Educ. Found, No. CIV. A. 95-4758, 1996 WL 383137 at *8 (E.D. Pa. July 8, 1996); see also Smith, 31 F.3d at 1487 (stating that the HCQIA does not require "peer review proceedings to look like regular trials in a court of law"). Blue Cross's failure to permit Dr. Singh to discuss the first audit with Dr. Clayton, and its unilateral selection of Dr. Clayton as the peer reviewer after Singh's failure to assist in the selection of a "mutually agreeable" peer reviewer, did not so compromise the first audit as to permit a reasonable jury to find that Dr. Singh had overcome the statutory presumption that Blue Cross afforded adequate notice and fair procedures.

**2. The Second Audit**

Dr. Singh argues that the RAC's recommendation that Blue Cross remove him from its panel of providers was unreasonable and based on a shoddy investigation. We again review the record to determine whether Dr. Singh has demonstrated that a reasonable jury could find that he overcame the statutory presumption that Blue

Cross performed this professional review action in accordance with the strictures of § 11112(a).

**a. In furtherance of quality health care and warranted by facts known**

We first consider whether Dr. Singh has rebutted the presumption that the RAC recommended his termination "in the reasonable belief that the action was in the furtherance of quality health care" and "in the reasonable belief that the action was warranted by the facts known." 42 U.S.C. § 11112(a)(1) and (4). To overcome the presumption, Dr. Singh must demonstrate that a reasonable jury could find that Blue Cross could not have "concluded that [its] action would restrict incompetent behavior or would protect patients." Egan, 971 F. Supp. at 42 (internal quotation marks omitted); accord Bryan, 33 F.3d at 1334-35. As explained herein, he fails to meet this burden.

Dr. Singh argues that the Fair Hearing Panel's ultimate decision to reverse the RAC's recommendation of his termination would permit a reasonable jury to find that the RAC could not have terminated him with a reasonable belief that this action would further quality health care. We disagree. The reversal of a peer review committee's recommendation of an adverse professional review action by a higher level peer review panel does not indicate that the initial recommendation was made without a reasonable belief that the recommendation would further quality health care. Austin, 979 F.2d at 735 (granting immunity even where a Judicial Review Committee reversed a Medical Executive Committee's recommendation

-29-

of adverse professional review action). The Fair Hearing Panel had more information before it when it reviewed Dr. Singh's case than the RAC did. The appropriate "inquiry is whether the decision was reasonable in light of the facts known at the time the decision was made, not in light of facts later discovered." Sklaroff, 1996 WL 383137 at *9. Although the Fair Hearing Panel's ultimate disposition of the case suggests that the RAC erred, it does not resolve the question whether the RAC had reasonable grounds to believe that its decision would further quality health care. See Imperial, 37 F.3d at 1030 ("[T]he Act does not require that the professional review result in an actual improvement of the quality of health care. Rather, the defendants' action is immune if the process was undertaken in the reasonable belief that quality health care was being furthered.").

When the RAC reviewed Dr. Singh's case, the primary source of information before it was Dr. White's audit, which extensively criticized Dr. Singh. Dr. White reported substandard care in thirty-three of the thirty-seven files he reviewed. As in Gabaldoni, "the record is replete with objective evidence of [Dr. Singh's] deviations from . . . the applicable standard of care; [Blue Cross] reasonably relied on . . . such evidence in support of its" professional review action. 250 F.3d at 261. Although Dr. Singh alleges several procedural irregularities in Dr. White's audit, he does not directly challenge Dr. White's conclusions in

-30-

any particular case.[14]     Moreover, Dr. Singh offers no reason why the RAC should have doubted the accuracy of Dr. White's assessment in any particular case.

Dr. White's report "questioned Dr. Singh's care of patients with chronic back and neck pain . . . , patients with emotional disorders . . . , and asthma patients." Singh v. Blue Cross & Blue Shield of Mass, Inc., 182 F. Supp. 2d 164, 174 (D. Mass. 2001).   Dr. White concluded that "[t]here is a general pattern of inadequate or delayed evaluation and treatment, and failure to refer. Competent [expert] care is rarely seen." Id. (citation omitted).  Furthermore, the physician members of the RAC did not just take Dr. White's report on faith--they also reviewed several of the patient records upon which it was based prior to the vote.  Thus, Dr. Singh has not demonstrated that a reasonable jury could find that he rebutted the statutory presumption that the RAC took its professional review action in the reasonable belief that

---

[14] We recognize that the sample of thirty-seven files given to Dr. White included four files of patients not treated by Dr. Singh, and all four of these files were among the thirty-three cases deemed by White as evidencing "substandard" treatment. Even if we eliminate these files, Dr. White's audit still would have concluded that twenty-six of the thirty-three remaining cases indicated substandard care. Dr. Singh contends that the inclusion of these cases indicates either that Blue Cross set out to terminate his contract (and merely used the bad audit results as a pretext for doing so) or performed the audit so poorly that Blue Cross could not reasonably believe that acting in accordance with its results would further quality health care. We consider these contentions in the next section of the opinion (addressing the adequacy of the procedures employed by Blue Cross).

its action was in furtherance of quality health care and was warranted by the facts known.  42 U.S.C. § 11112(a)(4).[15]

## b. Reasonable Investigation

For HCQIA immunity to attach to a professional review action, the decision must be taken "after a reasonable effort to obtain the facts of the matter."  42 U.S.C. §  11112(a)(2).  Dr. Singh claims that Blue Cross used "an unreasonably narrow procedure in obtaining the facts" it relied upon in deciding his case.  He asserts that this case is analogous to Brown, where the court determined that a reasonable jury could have found that the hospital's peer review action was not taken "after a reasonable effort to obtain the facts of the matter" because a witness testified that a peer review panel's reliance on "only two charts" prior to revoking a doctor's privileges "was unreasonably narrow and did not provide a reasonable basis for concluding Dr. Brown posed a threat to patient safety."  101 F.3d at 1334.  Dr. Singh argues that his review was as "unreasonably narrow" as Dr. Brown's, at least "with respect to the type of cases used," since, "[o]f the total of thirty-seven patient files submitted to Dr. White, 21 (57%) contained narcotic prescriptions."

Dr. Singh misconstrues Brown.  There, the court criticized the review as "narrow" because of the small sample of

---

[15] Dr. Singh renews his economic motivation argument in challenging the second audit.  We reject it for the same reasons we rejected it in discussing the challenge to the first audit.

cases it contained, not because the sample focused on one particular type of case. Courts have found that peer reviewers made a "reasonable effort to obtain the facts of the matter" even when they concentrated on areas of special concern. See Smith, 31 F.3d at 1483 (review committees focused on problem cases of the plaintiff doctor); Bryan, 33 F.3d at 1326-28 (review panels focused on incidents in which mercurial doctor abused hospital staff). Health care entities are entitled to focus on certain types of cases when these types of cases have caused concern. Moreover, Dr. Singh concedes that sixteen of the patient files submitted to Dr. White did not contain narcotic prescriptions. Thus, Dr. White and the RAC reviewed at least eight times as many randomly selected cases as Presbyterian Hospital's peer reviewer did in Brown.[16]

In a further challenge to Dr. White's audit, Dr. Singh asserts that "[t]he RAC: (1) erroneously reviewed the files of at least two (2) patients who were not treated by Dr. Singh; (2) selected a nonrandom sample of patient files showing exaggerated narcotic prescriptions practices." However, Dr. Singh does not explain why the inclusion of these two files in Dr. White's review

---

[16] Health care entities using both more files and fewer files than Blue Cross in their peer review actions have fulfilled the HCQIA standards for adequate fact-finding. Compare Mathews, 87 F.3d at 629 (discussing peer review action taken after a review of 208 cases revealed twenty-seven that "evidenced a substandard level of care") with Austin, 979 F.2d at 731 (identifying deficiencies in twenty-six of thirty cases reviewed), Egan, 971 F. Supp. at 40 (noting that an independent medical reviewer reviewed six cases, four of which "indicated significant inadequacies in . . . care.") and Fobbs, 789 F. Supp at 1066-67 (granting immunity to hospital that only reviewed four cases).

invalidated the conclusions drawn from the review of the numerous files that were indisputably his. As we have discussed above, Blue Cross was entitled to review a "nonrandom" sample of Dr. Singh's files. See Smith, 31 F.3d at 1483; Bryan, 33 F.3d at 1326-28. Admittedly, Blue Cross should have told the peer reviewer, Dr. White, that the sample was weighted toward cases involving narcotics prescriptions. However, this oversight was not material to Dr. White's findings.

Dr. White did not simply give a global evaluation of the cases he reviewed. Rather, he analyzed each case individually and concluded, in nearly all cases, that Dr. Singh provided substandard care. For example, Dr. White observed in one case that

> [c]hronic back pain is treated with narcotic analgesics (Darvon and Percocet) in addition to Lodine. Most internists would have tried to avoid the narcotic analgesics, which were prescribed in significant quantities over the year.

In a similar case, Dr. White observed:

> [L]ow back pain is treated with narcotic analgesics (Percocet) in addition to Motrin. Most internists would have tried to limit analgesic therapy to Motrin and other [nonprescription drugs].

Dr. White's twenty pages of notes on individual patients and five-page letter explaining his conclusions criticized Dr. Singh for far more than his narcotics prescription practices; they touched on many other areas of concern. Dr. White criticized Dr. Singh's care of patients with chronic back and neck pain as "significantly 'sub-standard,'" stated that Dr. Singh "failed to meet the minimal

standards of the medical community" in his treatment of patients with emotional disorders, and "failed to deliver quality care" to asthma patients. Dr. White concluded that "[t]here is a general pattern of inadequate or delayed evaluation and treatment, and failure to refer. Competent expert care is rarely seen."

"The relevant inquiry under § 11112(a)(2) is whether the totality of the process leading up to the [RAC]'s 'professional review action' [recommending that Blue Cross terminate Dr. Singh's participation] evidenced a reasonable effort to obtain the facts of the matter." Mathews, 87 F.3d at 637. Prior to the termination vote, Blue Cross had conducted two audits of Dr. Singh's practice (by two independent physicians), and the five physician members of the RAC had reviewed the audit reports and many underlying patient records. Although Blue Cross made some mistakes in forwarding the files to Dr. White for his review, the "[p]laintiff is entitled to a reasonable investigation under the Act, not a perfect investigation." Egan, 971 F. Supp. at 43 (citing 42 U.S.C. § 11112(a)(2)) (internal quotation marks omitted). Given the two audits and the level of attention Dr. White gave to each chart he reviewed, no reasonable jury could find that Dr. Singh overcame the statutory presumption that Blue Cross engaged in a reasonable effort to obtain relevant facts.

c. **Adequate Notice and Procedures**

Dr. Singh only presents one argument that the second audit did not afford him fair process, faulting Blue Cross for

failing to give him an opportunity to discuss with Dr. White the results of the second audit. However, again, "nothing in the [HCQIA] requires that a physician be permitted to participate in the review of his care." Sklaroff, 1996 WL 383137 at *8; see also Smith, 31 F.3d at 1487 (explaining that the HCQIA does not require "peer review proceedings to look like regular trials in a court of law"). Moreover, Blue Cross gave Dr. Singh the opportunity to challenge the White audit at the Fair Hearing Panel. Dr. Singh successfully challenged it there. Under these circumstances, no reasonable jury could find that Dr. Singh overcame the statutory presumption that Blue Cross provided him with procedures that were fair.

**E. The Immunity**

We have "examine[d] the evidence and the inferences reasonably to be drawn therefrom in the light most favorable to the nonmovant." Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir. 1987) (citations omitted). Summary judgment is warranted here because the evidence "is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome." Gibson v. City of Cranston, 37 F.3d 731, 735 (1st Cir. 1994) (describing standard for granting judgment as a matter of law, which also applies at the summary judgment stage). Given the overwhelming evidence of the care taken in the peer review process and the absence of any material dispute over historical facts, no reasonable jury could reject Blue Cross's assertion that its

-36-

professional review actions were taken in the reasonable belief that they would further quality health care, were warranted by the facts known, were based on adequate factfinding, and afforded Dr. Singh fair notice and procedure. Blue Cross is thus immune from liability for damages for the professional review actions which resulted from the first and second audits. Dr. White is also immune from liability because HCQIA immunity extends to "any person who participates with or assists [a peer review] body with respect to" actions arising out of a peer review. 42 U.S.C. 11111(a)(1)(D).

### III. The Scope of Immunity

HCQIA immunity only covers liability for damages. It does not shield covered defendants from suit and other forms of relief. See 42 U.S.C. § 11111(a)(1) (stating that health care entities "shall not be liable in damages" for peer review actions under certain conditions); Manion v. Evans, 986 F.2d 1036, 1042 (6th Cir. 1993) (concluding, after an exhaustive review of the legislative history, that "we are unable to find in HCQIA's grant of statutory protection the kind of explicit guarantee that trial will not occur that is demanded by Supreme Court case law" (emphasis in original) (citation omitted)). Therefore, we must determine whether Dr. Singh is seeking relief other than damages in this suit. If so, we must review de novo the district court's summary judgment determination that Dr. Singh could not prevail on the merits of any of his claims.

-37-

We turn to Dr. Singh's complaint to determine the nature of the relief sought in this lawsuit. At the conclusion of each of the first six counts of the complaint, Dr. Singh demands "judgment against the defendant, [Blue Cross], in an amount deemed just by the court, plus actual attorney's fees, interest and costs." (In Count VI, Dr. Singh asks that any judgment resulting from violations of Mass. Gen. Laws ch. 93A be tripled.) In the last count, entitled "Equitable Remedy: Dr. Singh v. [Blue Cross]," Dr. Singh requests the following:

> a. that [Blue Cross] reinstate Dr. Singh as a primary care provider and subscriber, without delay or subject to contingencies;
> b. that [Blue Cross] pay Dr. Singh reasonable attorney's fees, interest and costs;
> c. that [Blue Cross] pay Dr. Singh costs and attorney's fees associated with the appeal of the decision to terminate; and
> d. Such other relief as this court deems just.

Dr. Singh has already achieved his first aim; the Fair Hearing Panel reversed the RAC's provisional termination of Dr. Singh and reinstated him as a primary care provider and subscriber. Dr. Singh has not mentioned any "delay or contingencies" in this reinstatement that a court could now remedy. He therefore cannot be suing for this form of equitable relief. However, Dr. Singh's demand for "such other relief as this court deems just" is a familiar catchall that signals to the court that other forms of equitable relief may be appropriate. With its close involvement in the case, the district court went beyond the immunity analysis to

-38-

consider the merits of Dr. Singh's claims, thereby reflecting its view that relief other than damages might still be at issue in this case. Taking our cue from the district court, we go on to consider the merits of Dr. Singh's claims in order to determine whether he can seek any relief other than damages in further proceedings before the trial court.

## IV. Summary Judgment on the Merits

The district court concluded that Dr. Singh could not succeed on the merits of his claims. We agree and rely heavily on the district court's astute analysis.

### A. Contract Claims

Dr. Singh alleged in his complaint that Blue Cross violated the HMO Blue Physician Agreement, the implied covenant of good faith and fair dealing, and the Audit Agreement. Although he renews the good faith argument on appeal, he treats it so perfunctorily that we deem it waived.[17]  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").  On appeal, Dr.

---

[17] Dr. Singh alleged that Blue Cross violated an implied covenant of good faith and fair dealing by conducting its audits in an unreasonable manner.  The district court concluded that "there is no evidence in the record of bad faith on the part of Blue Cross, and therefore Singh's implied covenant of good faith and fair dealing contention fails."  Singh, 182 F. Supp. 2d at 177. On appeal, Dr. Singh neither directly argues that Blue Cross acted in bad faith nor challenges the district court's legal conclusion that he must do so.

Singh only develops his claim that Blue Cross violated the Audit Agreement.[18]

The complaints are familiar. Dr. Singh states that the first audit violated the Agreement because "Blue Cross did not select a mutually agreeable peer review consultant as required under the Audit Agreement," and it took a professional review action before Dr. Singh was able to talk to Dr. Clayton about the audit. However, as explained earlier, the record demonstrates that Singh was largely responsible for this state of affairs. The parties initially could not agree on a peer reviewer, with Dr. Singh refusing to accept any of the physicians nominated by Blue Cross. Although the physician nominated by Dr. Singh (Dr. Criss) worked at the same hospital as Dr. Singh, Blue Cross agreed to permit him to conduct the review. However, when Dr. Criss received the relevant paperwork, he decided not to conduct the review. After Dr. Singh failed to respond to Blue Cross's request that he nominate another physician, Blue Cross appointed Dr. Clayton to

---

[18] Dr. Singh also claims that Blue Cross violated his rights by failing to satisfy the requirements of the HCQIA. However, the HCQIA does not create a private cause of action. See Wayne v. Genesis Med. Ctr., 140 F.3d 1145, 1148 (8th Cir. 1998) (joining "the Tenth and Eleventh Circuits in concluding that the HCQIA does not explicitly or implicitly afford aggrieved physicians a cause of action when a hospital fails to follow" HCQIA standards) (citing Hancock v. Blue Cross-Blue Shield of Kan., Inc., 21 F.3d 373, 374-75 (10th Cir. 1994) (holding that the HCQIA does not explicitly or implicitly create a private cause of action for physicians subjected to peer review; Congress did not intend to create a cause of action for the benefit of physicians), and Bok v. Mut. Assurance, Inc., 119 F.3d 927, 928-29 (11th Cir. 1997) (per curiam) (agreeing with Hancock that the HCQIA does not create a cause of action for physicians)).

perform the review.  Therefore, Dr. Singh was at least as responsible for the "unfair" appointment of Dr. Clayton as was Blue Cross.  Dr. Singh cannot claim that Blue Cross's failure to appoint a "mutually agreeable" peer reviewer made the first audit unfair when his failure to cooperate with Blue Cross led to this result.  Moreover, "[b]ecause Singh himself was not reliable in meeting the deadlines imposed by the Audit Agreement," he cannot fault Blue Cross for expediting a process which he had done much to delay.  Singh, 182 F. Supp. 2d at 177.

Dr. Singh also claims that some features of Blue Cross's second audit violated the Audit Agreement.  However, the Audit Agreement covered only the first audit.  The Agreement states that it was made by Blue Cross "on behalf of its Bay State Health Care line of business," and addresses an audit to determine whether Blue Cross should "admit[] [Dr. Singh] into its Bay State product."  The Audit Agreement applied to all inquiries to determine whether Dr. Singh should be admitted to the Bay State line.  However, by the time the second audit occurred, those inquiries were over: the RAC had voted not to admit Dr. Singh to the Bay State line, and the Bay State line itself had expired.  Nothing in the Audit Agreement restricts Blue Cross's right to conduct a peer review of Dr. Singh with respect to the indemnity or the HMO Blue Products, or places conditions on such an audit.  Singh cannot argue that Blue Cross's second audit violated the Audit Agreement because that contract by its own terms did not apply.

-41-

## B. 93A Claims

Chapter 93A provides a cause of action to

[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of . . . an unfair or deceptive act or practice . . . .

Mass. Gen. Laws ch. 93A, § 11; see also id., § 2 (establishing that "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful).  Dr. Singh argues that Blue Cross violated Mass. Gen. L. ch. 93A by 1) failing to meet the HCQIA standards, 2) violating the Audit Agreement, and 3) violating the implied covenant of good faith and fair dealing.

We have already determined that no reasonable jury could determine that Blue Cross failed to meet the HCQIA standards.  We have also addressed above, as contractual claims, Dr. Singh's arguments that Blue Cross violated the Audit Agreement.  Assuming arguendo that Blue Cross's actions may technically have violated a contract that Dr. Singh had already flouted, they by no means reach "'a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.'" Quaker State Oil Ref. Corp. v. Garrity Oil Co., Inc., 884 F.2d 1510, 1513 (1st Cir. 1989) (quoting Levings v. Forbes & Wallace, Inc., 396 N.E.2d 149, 153 (Mass. 1979)).  Chapter 93A only proscribes that level of improbity, and we endorse the district court's holding

-42-

that "Singh has shown no conduct by Blue Cross that a reasonable factfinder could find meets this demanding standard." Singh, 182 F. Supp. 2d at 180.

## C. Defamation Claim Against Dr. White

Although Dr. Singh sued both Blue Cross and Dr. White for defamation, he only appeals the district court's entry of summary judgment on the defamation claim against Dr. White. Dr. Singh claims that the following elements of Dr. White's report to the RAC were defamatory:

> a. "[Singh's prescription of] large numbers of narcotic analgesics . . . raises serious questions about this practitioner. It may need official review;"
>
> b. "narcotic analgesics are liberally prescribed . . . raise[s] serious questions about the veracity of this practitioner . . . ;"
>
> c. "This practitioner seems to have a low threshold for prescribing narcotic analgesics;" and,
>
> d. "? Public Health Menace."

Under Massachusetts law, "[a] defamatory communication is protected by a conditional common law privilege provided the publisher and recipient share some legitimate mutual interest 'reasonably calculated' to be served by the communication." Catrone v. Thoroughbred Racing Ass'ns of N. Am., Inc., 929 F.2d 881, 887 (1st Cir. 1991) (internal quotation marks omitted). Here, Dr. White and Blue Cross shared a "legitimate mutual interest" in peer review. Accordingly, the district court found correctly that these

-43-

statements are protected by the conditional common law privilege. Singh, 182 F. Supp. 2d at 179 (holding that Dr. White's "statements in the audit report are protected by the common law privilege, and Singh has presented insufficient evidence to surmount the privilege").

Dr. Singh argues that malicious intent abuses the conditional common law privilege. "On motion for summary judgment, the plaintiff bears the burden of establishing abuse of the conditional privilege by clear and convincing evidence." Catrone, 929 F.2d at 889 (internal quotation marks and citations omitted). As evidence of such malice, Dr. Singh offers the "unreasonable methods used to review Singh's practice." We have already decided in our discussions of immunity that no reasonable jury could find that the methods used to review Dr. Singh's practice were unreasonable. We see no reason to change our minds now.

## D. Tortious Interference with Business Advantage

The elements of tortious interference with business advantage are:

> (1) a business relationship or contemplated contract of economic benefit;
> (2) the defendant's knowledge of such relationship;
> (3) the defendant's interference with the relationship through improper motive or means; and,
> (4) the plaintiff's loss of advantage as a direct result of the defendant's conduct.

-44-

Brown v. Armstrong, 957 F. Supp. 1293, 1304-05 (D. Mass. 1997), aff'd, 129 F.3d 1252 (1st Cir. 1997) (table opinion).

Dr. Singh argues that eight pages of his deposition testimony demonstrated that he "suffered a substantial loss of his patient base" because of Blue Cross's peer review actions. This deposition testimony begins with Dr. Singh's incorrect assertion that "I know for sure my panel was frozen." The RAC only recommended that Dr. Singh's panel be frozen; it never actually took this step. Dr. Singh then asserts that his name was not on a Blue Cross directory, that his patients (and prospective patients) noticed this, that Blue Cross's investigation of him "became public knowledge," and that patients started leaving (or failing to sign up for) his practice. Yet Dr. Singh does not name a single member of the public to whom the investigation was disclosed. He repeatedly evaded direct questions on whether anyone actually told him that Blue Cross disclosed the investigation to them. Assuming arguendo that the investigation actually was disclosed to individuals outside of Blue Cross, Dr. Singh does not even estimate how many patients actually left or avoided his practice on account of it. We cannot improve on the district court's evaluation of the evidence:

> Singh may not speculate about future business relationships when alleging this tort; instead, only a "probable future business relationship anticipating a reasonable expectancy of financial benefit" suffices. Because Singh has presented no evidence of a specific business relationship that was

-45-

> interfered with by Blue Cross, summary
> judgment is granted for Blue Cross. ____

Singh, 182 F. Supp. 2d at 178 (citation omitted) (quoting Brown, 957 F. Supp. at 1305). The grant of summary judgment was correct.

### V. Conclusion

Blue Cross's audits undoubtedly cost Dr. Singh money, time, and distress. He understandably has strong feelings about his experience. However, no reasonable jury could find that Blue Cross failed to meet the HCQIA standards that entitled it and Dr. White to immunity from damages. Moreover, no reasonable jury could find for Dr. Singh on the merits of his claims. We therefore affirm the district court's entry of summary judgment for Blue Cross and Dr. White.

        Affirmed.