Fishman, J.
Introduction
This is an action brought by Dr. Harvey G. Clermont (“Clermont”) against Fallon Clinic, Inc. (“Fallon Clinic” or “Fallon”), Dr. Jonathan Harding, Dr. Baltej Maini, Dr. Mark Stoker, Dr. Peter Lucas, Lee Beaudoin, Teena Osgood, and Bruce Plummer (collectively, “the defendants”). The defendants move for summary judgment on the plaintiffs twelve-count Amended Complaint. The Amended Complaint alleges that the defendants defamed Clermont (Count I); engaged in an unlawful civil conspiracy (Count II); breached the covenant of good faith and fair dealing implied in his Employment Agreement (Count III); breached his contract of employment with Fallon (Counts IV and X); tortiously interfered with his employment contract (Count V); violated his statutory right to privacy under G.L.c. 214, § IB (Count VI); violated his constitutional rights under G.L.c. 12, §11I (Count VII); breached their fiduciary duties (Counts VIII, IX, and XI); and engaged in age discrimination (Count XII). The defendants claim that they are entitled to immunity from liability for money damages under the Health Care Quality Improvement Act, and that even if this Court finds otherwise, it should allow their motion for summary judgment because no genuine dispute of material fact exists.
For the reasons below, the defendants’ motion for summary judgment is DENIED in part and ALLOWED in part.
Background
The following is the background of the case, but more detail is added below as it becomes relevant to the legal analysis. The court considers the evidence in the light most favorable to the nonmoving party.
In February of 1973, Fallon hired Clermont as a general surgeon. Clermont signed an Employment Agreement which provides that he may be terminated for cause on grounds such as failure to comply with all applicable Medical Staff By-Laws and regulations; failure to maintain appropriate medical and administrative records in accordance with applicable policies and regulations; or other conduct that may be harmful to the business, interests, or reputation of the Fallon Clinic.
Fallon is a for-profit professional entity incorporated in Massachusetts. It employs over 200 physician-shareholders with each of its physician-shareholders owning one share of Fallon’s Class A stock. This ownership structure is essentially the same as it was during the 1999 to 2000 period. The defendants assert that Fallon is a health care entity which is regulated by statutes protective of patients’ rights and well-being. Specifically, in accor *326 dance with G.L.c. 111, §203, Fallon must conduct reviews of its medical staff and partake in risk management programs to ensure that its patients are provided with high quality medical care. To further this purpose, in December 1999, Fallon adopted a Policy for Termination for Substandard Clinical Care (the “Policy”) in accordance with the Heath Care Quality Improvement Act of 1986 (“HCQIA"), 42 U.S.C. §1101 et seq.[2] Fallon is also required by law to report disciplinary actions it takes against physicians to the Board of Registration in Medicine (“BRM”). Clermont contends that Fallon failed to follow statutorily authorized formal peer review procedures in his case and, therefore, is not protected by the immunity provided by HCQIA.
Clermont claims that in 1998 or early 1999, before any alleged peer review committees were convened, Dr. Stoker, Director of Fallon’s Division of General and Vascular Surgery, and Dr. Maini, President of Fallon,[3] and later Dr. Harding, Chief Medical Officer,[4] began efforts to terminate him. From January 21, 1998 to September 12, 1999, Stoker and Dr. Michael Kelleher, Fallon’s Medical Director of Quality Management, investigated Clermont’s compliance with Fallon’s informed consent policy. Stoker investigated Clermont’s surgical outcome data in 1998. In the summer of 1999, Stoker, Maini, and/or Harding retained Dr. Nicholas P. W. Coe to evaluate Clermont’s surgical care cases. Clermont alleges that all of the information stemming from these efforts began before any alleged peer review committees came into existence, and served to form the basis of his termination.
On October 15, 1999, a committee convened to discuss the propriety of surgical care Clermont provided to a patient. Clermont contends that this committee did not constitute an appropriate peer review committee because Fallon’s Peer Review Policy requires that such a committee have at least two physicians of a speciality similar to that of the affected physician. The October committee consisted of two non-physician lay people, Mr. Beaudoin, Fallon’s former Administrator, and Ms. Maureen Corcoran;[5] two physician administrators, Dr. Harding and Dr. Kelleher; and a pediatrician, Dr. William Primack. Clermont contends that Harding and Kelleher did not have the appropriate background to evaluate surgical care and that there were no surgeons on the committee. He also claims that this committee was improper because the members sent the minutes to Stoker and Maini for their review and correction, even though these doctors were not members on the committee and despite the fact that this is not provided for in the Peer Review Policy. He further contends that Dr. Maini reviewed the minutes even though the medical care Maini provided was at issue before the committee.
1. The Januaiy 21, 2000 Committee
On January 21,2000, Fallon convened a committee to consider concerns regarding Clermont’s clinical competence and professional conduct. The individuals present at that meeting were Kelleher, Harding, Maini, Stoker, Beaudoin, Corcoran, and Osgood.
Clermont alleges that the Januaiy 21, 2000 Committee (“Januaiy Committee”) was not a legitimate peer review committee. He claims that despite the fact that Stoker, Maini, and Harding had already made up their minds about Clermont, they were all allowed to serve on the Januaiy Committee; and that even though Stoker’s and Maini’s medical care was at issue in some of the cases before the committee, they were still permitted to serve on the committee. He contends that the Januaiy Committee failed to conduct an independent investigation of the issues before it and did not review any relevant medical records or other relevant documents.
The Januaiy Committee reviewed (1) Clermont’s failure to comply with Fallon’s informed consent requirements; (2) his malpractice histoiy; (3) cases of his inpatient and outpatient care; and (4) his surgical outcome data. The Committee noted that between Januaiy 21, 1998 and November of 1999, Clermont received six written or verbal warnings regarding his failure to comply with Fallon’s informed consent requirement by not adequately documenting preoperative informed consent; that the Quality Management staff reviewed fifteen charts of Clermont’s patients who had non-elective procedures and stated only two of those fifteen cases had documentation that Clermont himself had informed the patient and/or family about the risks and benefits of the procedure; and that an external expert consultant, Dr. Coe, reviewed a series of Clermont’s general surgical cases. Stoker and Maini advised the Januaiy Committee members of the summary findings of Coe’s reviews. Coe reviewed seven of Clermont’s cases and found five of them to constitute substandard care. The Committee relied on four of these five so-called substandard care cases.
The Januaiy Committee also reviewed the care Clermont provided to three of his outpatients, finding two to be substandard.[6] It noted Clermont’s track record for performance of laparoscopic cholecystecto-mies and carotid endarterectomies and that this data suggested to Stoker that Clermont’s “conversion rate from laparoscopic cholecystectomy to open cholecys-tectomy” to be higher than an “acceptable community standard.” Lastly, the Committee found that Clermont’s litigation and settlement rate exceeded the rates for other physician members of his division.
The Januaiy Committee unanimously recommended that Clermont be terminated. On Januaiy 28, 2000, Harding and Beaudoin met with Clermont to inform him that he was being suspended with pay pending the Management Council’s review of the recommendations. Clermont did not receive the right to request a hearing at this time.
2. The Management Council
On February 10, 2000, Fallon’s Management Council (the “Council”) convened to consider the charges against Clermont and the Januaiy Committee’s term! *327 nation recommendation. Members of the Council included Dr. Lucas, Mr. Plummer, Dr. Maini, Dr. Harding, Ms. Osgood, and Mr. Beaudoin. Dr. Kelleher also attended.
The Council relied on three of the four cases that the January Committee found to be substandard. Harding and Kelleher reviewed Clermont’s performance with regard to quality health care delivered to his patients. The Council reviewed potential mitigating circumstances. After approximately one and one half hours, the Council voted unanimously to approve the recommendation of the Peer Review Committee and the Medical Director. In a letter dated February 14, 2000, Fallon notified Clermont of his termination, the grounds for same, and his right to appeal under Fallon’s policy. Fallon filed a report with the BRM.
3. The Hearing Panel
By letter dated March 10, 2000, Clermont claimed his right to an appeal hearing pursuant to Fallon’s policy. Fallon notified Clermont that it had appointed five of Fallon’s physician-shareholders to the Panel. Clermont exercised his right under the policy to strike two Fallon-appointed members, and appointed two members of his own choosing to the Panel. Clermont alleges that after he exercised his right to strike the Fallon-appointed members, Fallon, without apparent authoriiy, replaced one of the remaining three Panel members with a physician of their choosing, not allowing Clermont to challenge this member. Consistent with the policy, Clermont and Fallon engaged in extensive discoveiy.
On October 10, 2001, Fallon appointed Charles K. Bergin, Jr., Esq., of Springfield, Massachusetts, to serve as the Hearing Officer. Bergin decided to bifurcate the appeal into a “liability” phase and, if necessary, a “disciplinary” phase.
On July 12, 2000, Clermont initiated a proceeding at the MCAD, claiming that his termination had been motivated by age discrimination. On July 20, 2001, Clermont commenced the instant action in the Superior Court. On January 24, 2002, the Superior Court ordered the action stayed pending the completion of Clermont’s appeal.
The liability phase of the hearing began on March 18, 2002, and concluded on May 22, 2002. Clermont challenged the proceeding as being procedurally improper because the Policy requires that a physician is entitled to a hearing before he is terminated, and moved to strike the Chair of the Panel. The Hearing Officer rejected Clermont’s motion. Testimony and documentary evidence, including the minutes from the January Committee and the Council, the termination letter, and all documentary evidence that was part of the records of the earlier hearings were presented over a period of five days. Specifically, the Hearing Panel received evidence regarding Clermont’s failure to adhere to Fallon’s informed consent policy, three surgical cases, three outpatient care cases, Clermont’s surgical outcome data, malpractice history, and his behavior. Surgical case 1 concerned Fallon’s charge that “transection of the recurrent laiyngela nerve is an unacceptable complication of an elective thyroidec-tomy and secondly that there was no physician documentation of subsequent evaluation or treatment of the problem.” Surgical case 2 concerned a charge that Clermont “performed a cholecystectomy on a patient who had evidence for retained ductal stones at the time of the procedure, but for whom [he] failed to adequately clear the duct intra-operatively in the early post-operative phase.” The other surgical case involved Clermont’s failure to personally examine and evaluate “a patient who had undergone an aortic valve replacement coronary artery bypass surgery” and “developed evidence of iritra-abdominal bleeding.” Outpatient case 1 concerned Clermont failing to request lab studies for a patient who was receiving Gentamicin and suffered from acute renal failure, most likely from Gentamicin toxicity. Outpatient case 2 concerned Clermont’s failure to personally examine, and arrange for proper follow-up care for a patient who suffered from a non-healing foot ulcer. Outpatient case 3 concerned Clermont’s failure to expeditiously treat a patient, resulting in the unnecessary prolongation of the patient’s pain and suffering, and Clermont’s failure to return phone calls. Clermont’s surgical outcome data concerned his conversion rate from laparoscopic cho-lecystectomies. The malpractice history detailed his malpractice litigation and settlement rates, as well as his total loss history.
On June 5, 2002, after receiving written statements and hearing closing arguments, the Panel issued its “Preliminary Findings” regarding liability, and held that there was a preponderance of evidence to show that Clermont failed to comply with Fallon’s informed consent policy despite a combination of five verbal and written warnings, and therefore, “a form of discipline” was warranted. With regard to the three surgical cases reviewed, Clermont was essentially exonerated. Similarly, none of the three outpatient cases were found to represent substandard care.
The Panel convened for a seventh day for the disciplinary phase, and received further evidence. On July 29, 2002, the Panel issued its “Final Findings, Decision, and Report,” which state in pertinent part:
after hearing the parties and their evidence, the Hearing Panel agrees, finds, and affirms, as set forth in their preliminary findings, that the Fallon Clinic has proven by a fair preponderance of the evidence that Dr. Clermont is subject to disciplinary action for recurrent disregard for Fallon Clinic Policies regarding informed consent despite prior admonition by medical staff leadership, which disciplinary action includes suspension or even termination.
*328 [T]he majority of the Hearing Panel finds that the Fallon Clinic has satisfactorily proven by a fair and preponderance of the evidence that the action or recommendation of the Fallon Clinic dated February 14, 2000 to terminate Clermont is reasonable and warranted and the majority of the Hearing Panel hereby confirms the recommended discipline of termination imposed upon Dr. Clermont by the Fallon Clinic on February 14, 2000.
While the minority of the Panel would have recommended that the discipline be reduced to suspension, they agreed Fallon has the right to terminate Clermont on the proven charges. Fallon submitted an updated and final report to the BRM.
Discussion
I. Health Care Quality Improvement Act Immunity
The threshold question is whether the defendants are entitled to immunity under the Health Care Quality Improvement Act. Congress passed HCQIA to improve the quality of medical care by encouraging physicians to participate in the review of incompetent and unprofessional physicians. H.R. Rep. No. 903, 99th Cong., 2d Sess. 2 (1986), reprinted in 1986 U.S.C.C.A.N. 6287, 6384, 6384. The HCQIA grants qualified immunity to professional review bodies, and others who participate in the review action, provided that the professional review is taken:
(1) in the reasonable belief that the action was in the furtherance of quality health care;
(2) after a reasonable effort to obtain the facts of the matter;
(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and
(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
42 U.S.C. §11112(a)(l)-(4).
A professional review action is defined in the Act as:
an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.
42 U.S.C. §11151(9). In other words, a professional review action “encompasses decisions or recommendations by peer review bodies that directly curtail a physician’s clinical privileges or impose some lesser sanction that may eventually affect a physician’s privileges.” Mathews, M.D. v. Lancaster General Hospital, 87 F.3d 624, 634 (3d Cir. 1996). “Whether defendants are entitled to immunity for terminating Clermont’s employment is ‘a question of law for the court to decide whenever the record is sufficiently developed.' ” Egan v. Athol Memorial Hosp., 971 F.Sup. 37, 42 (D.Mass. 1997) (emphasis added).
The HCQIA sets a rebuttable presumption that the peer review action satisfied the “preceding standards necessary for immunity." Brown v. Presbyterian Healthcare Services, 101 F.3d 1324, 1333 (10th Cir. 1996). The plaintiff challenging the review action can rebut this presumption if he demonstrates that a reasonable jury, viewing the facts in the light most favorable to him, could find by a preponderance of the evidence that the defendants did not satisfy one of the HCQIA standards. Singh v. Blue Cross/Blue Shield of Massachusetts, Inc., 308 F.3d 25, 32 (1st Cir. 2002).
In the instant case, the Fallon Clinic took three professional review actions with respect to Clermont: (1) The January Committee suspended him with pay and recommended he be terminated; (2) the Council’s decision accepted the January Committee’s recommendation to terminate; and (3) Hearing Panel affirmed the Council’s decision to terminate. In order for immunity to attach to the defendants, the action taken by each of these three review bodies must fulfill the four criteria set forth at 42 U.S.C. §11112(a). Singh, 308 F.3d at 37; Mathews, 87 F.3d at 634; 42 U.S.C. §11112(a).
A. Reasonable Belief that Action Was in Furtherance of Quality Health Care
Clermont maintains that he has raised material issues of fact as to whether the January Committee and the Council members acted “in the reasonable belief that the action was in furtherance of quality health care,” as required under §11112(a)(1). “Under §11112(a)(1), this standard ‘will be satisfied if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients.’ ” Mathews, 87 F.3d at 635. “Courts utilize an objective standard of reasonableness when considering whether a defendant has met the statutory requirements ... It is important to note that a defendant’s subjective bad faith or hostility is irrelevant.” Egan, 971 F.Sup. at 42 (internal quotations omitted).
Clermont contends that the defendants did not reasonably believe their actions were in furtherance of quality health care because the January Committee and the Council failed to even cursorily investigate the *329 charges but rather relied exclusively on the chart and record summaries provided by Maini and Stoker and the termination letter. Although a review of the Hearing Panel proceedings may suggest that with more information these earlier committees would have reached a different conclusion, “[t]he appropriate inquiry is whether the decision was reasonable in light of the facts known at the time the decision was made, not in light of facts later discovered.” Singh, 308 F. 3d at 41. Significantly, Clermont has not presented this Court with evidence that “the professional review action taken . . . was motivated by anything other than a reasonable belief that it would further quality health care.” Mathews, 87 F.3d at 635. While it would have been prudent for the committees to have looked at the actual records and charts at issue, there is no record evidence of why the committees should have “doubted the accuracy” of Maini and Stoker’s information. Singh, 308 F.3d at 41. Clermont also argues that the defendants did not reasonably believe that they were furthering quality health care because the issue of informed consent documentation relates to legal risks to Fallon, not to quality health care. To the contrary, obtaining a patient’s informed consent is an integral part of the delivery of quality health care. Clermont has not rebutted the presumption that the defendants’ actions were taken in the reasonable belief that they were furthering quality health care. Accordingly, the defendants meet the requirement of §11112(a)(1).
B. Reasonable Effort to Obtain Facts
The statute provides that a professional review action must be taken after a review committee made a reasonable effort to obtain the facts of the matter. 42 U.S.C. §11112(a)(2). The question in this case is whether both the January Committee and the Council (collectively “the committees”) failed to make a reasonable effort to obtain the facts because they did not conduct an independent investigation of the allegations, but rather, simply approved the recommendations and information provided to them by Maini, Stoker, Harding, and Coe. The committees considered the following issues: (1) Clermont’s failure to comply with Fallon’s informed consent requirements; (2) his malpractice history; (3) cases of his inpatient and outpatient care; and (4) his surgical outcome data.
In Imperial, M.D. v. Suburban Hospital Ass’n, 862 F.Sup. 1390 (1993), the Chairman of Medicine reviewed the plaintiffs quality assurance file (“QAF”); the Credentials Committee independently reviewed the plaintiffs QAF, along with the plaintiffs records, and the Chairman of Medicine’s recommendation; and the Executive Committee reviewed the findings of the Credentials Committee as well as the relevant records. The Imperial court found that the plaintiff failed to demonstrate that the defendants did not make a reasonable effort to obtain the facts when he “adduce[d] no evidence in support of his contention that the Credentials Committee and Executive Committee did not independently investigate his charges.” Id. at 1398. Here, however, Clermont, has presented evidence that the committees did not engage in their own independent investigation. They did not look at the relevant medical records when considering Clermont’s compliance with the informed consent requirements. Instead, the committees relied on various audits that were conducted of Clermont’s medical records. These committees undertook no independent investigation of his malpractice history, but rather relied on information provided by Harding. In addition, these committees relied on Coe’s summary of Clermont’s general surgical cases that were at issue, without attempting to question Coe’s opinions or independently review the relevant medical records and patient charts. Finally, there is evidence that the committees did not independently investigate Clermont’s outcome data but instead relied on the information provided by Stoker.
In Brader v. Allegheny General Hospital, 167 F.3d 832 (3d Cir. 1999), the physician argued that the defendants did not make a reasonable effort to obtain the facts because they relied on a flawed report. The court rejected this argument because the flawed report was not the “only source! ] of information used in reaching” the professional review action. Id. at 841.[7] In the case at bar, however, on each separate issue, the reports appear to be the only source of information relied upon to support the professional review action. Furthermore, there is evidence tending to show that, with regard to Clermont’s outpatient care, the defendants recklessly reviewed those cases. For example, with regard to outpatient case 2, the January Committee found that “the patient went on to have more serious extension of his foot ulcer . . .” Had the Committee actually reviewed the case file, they would have found that “the patient remained stable and even showed some improvement.” Moreover, the committees spent little more than one hour reviewing all the above matters, and neither committee produced the actual informal consent policy on which they based Clermont’s termination. Finally, a reasonable jury could conclude that the January Committee did not consist of the appropriate peer reviewers because it included two non-physician lay people.
“The relevant inquiry under (a)(2) is whether the totality of the process leading up to the [] professional review action . . . evidenced a reasonable effort to obtain the facts of the matter.” Mathews, 87 F.3d at 637. While Clermont is entitled to a reasonable investigation under the Act and not a perfect investigation, Egan, 971 F.Sup. at 43, viewing the facts in the light most favorable to Clermont, a reasonable jury could conclude that he has shown by a preponderance of the evidence that the investigations preceding the professional review actions were obviously insufficient, and, therefore, unreasonable. Accordingly, Clermont has rebutted the presumption that the defendants made a *330 reasonable effort to ascertain the facts of the matter before each professional review action was taken.
C. Adequate Notice and Hearing Procedures
In order for immunity to attach, the HCQIA requires that a professional review action is taken “after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances.” 42 U.S.C. §1112(a)(3). Section 11112(b) describes the notice procedures yet notes that “[a] professional review body’s failure to meet” such conditions “shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section.” According to §11112(b) (A) (i), a health care entity has satisfied the notice requirement if the physician has been given notice stating, among other things, that a professional review action has been proposed to be taken against the physician.
“Statutory language is given effect consistent with its plain meaning and the intent of the Legislature.” Perry v. Commonwealth, 438 Mass. 282, 284 (2002). Section 11112(a) (3) reads for immunity to attach “a professional review action must be taken . . . after adequate notice and hearing procedures are afforded to the physician involved or after such procedures as are fair to the physician under the circumstances ...” (emphasis supplied). Therefore, the plain meaning of §11112 requires that both notice and a hearing take place before the execution of the proposed action. Here, the committees convened to consider charges against Clermont regarding allegations of substandard care, failure to comply with Fallon’s informed consent policy, high malpractice history, problematic conversion rates, and inappropriately conducting himself at work. Both of these committees took professional review actions relevant to Clermont. Specifically, the January Committee recommended that he be suspended with pay and that he be terminated, and the Council recommended to accept the recommendation that he be terminated. These recommendations constituted professional review actions as defined by HCQIA. In order for immunity to attach to these review actions, Clermont must have been notified and afforded hearing procedures or other fair procedures before the committees executed their proposed review actions.
The defendants claim that Clermont’s process included notices that his failure to comply with the informed consent policy was placing his employment at Fallon in jeopardy. Assuming that those notices were legally sufficient, they only pertain to the informed consent issue. Clermont did not receive any pre-termination notification regarding the other allegations. Clermont was first notified of a professional review action against him on January 28, 2000, when Harding and Beaudoin met with him to inform him that he was being suspended with pay pending the Council’s review of the January Committee’s recommendations. Obviously, this verbal notification came subsequent to the January Committee’s review action. At that time, Clermont was not afforded any procedural right to a hearing. Thereafter, on February 14, 2000, Harding sent Clermont a termination letter notifying him that he had been terminated as of February 10, 2000. The letter also notified Clermont of his right to appeal the termination decision. Therefore, Clermont was only provided with an opportunity to address the charges brought against him after he was already terminated.
In connection with the March 2002 Hearing Panel proceeding, Clermont exercised rights to extensive discovery, participated in the selection of the Panel, and had a full adversarial hearing. Because § 11112(a) (3) requires the professional review action to be taken only after the physician was provided with fair procedures, and two prior professional review actions were taken here before Clermont was finally provided with fair procedures, the defendants are not entitled to immunity under the HCQIA. Compare Egan, 971 F.Sup. at 40-42 (at each stage of review, the plaintiff-physician was notified of the peer review committee’s recommendation and allowed to respond or discuss the reasons for the recommendation and the recommendation itself); Mathews, 87 F.3d at 637-38 (physician afforded adequate notice and hearing procedures where he was provided notice and allowed to respond at each step of his peer review process, and where he received a hearing before Board implemented its proposal to restrict clinical privileges); Brader, 167 F.3d at 842 (physician afforded adequate notice and hearing where defendants gave physician “notice of each professional review action to be taken” and afforded him a hearing on each professional review action to be taken before they were implemented); Imperial M.D., 862 F.Sup. at 1397 (same); Meyer v. Sunrise Hosp., 22 P.3d 1142, 1152 (Nev. 2001) (finding Section 11112(b) to require that “the medical facility provide the physician with adequate notice of the hearing, including the proposed action to be taken ...”) (emphasis added). Significantly, the defendants have not cited, nor has this Court found any case law holding §11112(a)(3) is satisfied with notification to the plaintiff-physician and provision for a hearing subsequent to termination. Thus, “(t]he failure to provide a physician with adequate notice and fair procedures precludes immunity under the HCQIA." Sugarbaker v. SSM Healthcare, 190 F.3d 905, 915 (8th Cir. 1990) (finding adequate notice and hearing where plaintiff-physician was notified during each phase of the peer review process).
Nor does the record support defendants’ claim that the discharge of Clermont on February 10, 2002, was “conditional.” On January 28, 2000, Harding and Beaudoin met with Clermont to inform him that he was being suspended with pay pending the Council’s review of the matter. The summary judgment record contains no evidence that at that meeting Harding and Beaudoin informed Clermont of the reasons for his suspension or afforded him an opportunity to investigate the charges against him before the Council con *331 vened. The February 10th letter simply notified Clerm-ont that he had been terminated and the bases for his termination. A reasonable jury could conclude that Clermont has shown by a preponderance of evidence that the defendants did not provide him with adequate notice and process until after his termination in violation of §11112(b). Clermont has overcome the statutory presumption that the defendants met the due process requirements of HCQIA, and, therefore, the defendants are not entitled to immunity.
D. Reasonable Belief that Action Was Warranted
The final requirement under HCQIA is that a professional review action was taken in the reasonable belief that it “was warranted by the facts known.” §11112(a)(4). In evaluating a professional review action under §11112(a)(4), “the court must not reweigh the evidence or substitute its own judgment for that of the peer review committee.” Egan, 971 F.Sup. at 44. “To overcome the presumptidn, [Clermont] must demonstrate that a reasonable jury could find that [Fallon] could not have ‘concluded that [its] action would restrict incompetent behavior or would protect patients.’ ” Singh, 308 F.3d. at 41, quoting Egan, 971 F.Sup. at 42. Viewing the evidence in the light most favorable to the defendants, as in Egan, Clermont has “produced no evidence, beyond mere allegation, to show that anyone [at Fallon] exaggerated or manufactured complaints or had a clear economic motive to deny him privileges.” 971 F.Sup. at 44.
In sum, the Court finds that the defendants failed to make a reasonable effort to obtain the facts and denied Clermont due process, and therefore, immunity has not attached to the defendants’ professional review action. Accordingly, the defendants’ motion for summary judgment dismissing Clermont’s claim for money damages in Counts I-V and Counts VE-XI of his Amended Complaint is DENIED.
II.Collateral Estoppel
Collateral estoppel precludes a litigant from re-litigating a matter if “(1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party . . . to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication.” Tuper v. North Adams Ambulance Service, Inc., 428 Mass. 132, 134 (1998). The defendants contend that Clermont is precluded from re-litigating his claims of breach of contract, tortious interference with his contract, breach of covenant of good faith and fair dealing implied in his contract, civil conspiracy, breach of fiduciary duty, and his challenge that the policy required that the hearing be held prior to his termination because he litigated these issues at the Panel Hearing of March 2002 that concerned the question of whether termination was the appropriate discipline for Clermont. The defendants argue that this is the identical issue now before this Court.
Final orders of administrative proceedings can preclude relitigation of the same issues between the same parties, and this rationale also applies to final orders of arbitration as long as the party against whom issue preclusion is sought was provided with a “full and fair opportunity to litigate the issue." Bailey v. Metropolitan Property and Liability Ins. Co., 24 Mass.App.Ct. 34, 37-39. In the case at bar, however, the proceeding before the Hearing Panel was not in the nature of an administrative agency or an arbitration proceeding. There was no strictly independent, impartial arbitrator, but rather a panel consisting of Fallon employees and shareholders, proceeding at a hearing on Fallon premises. The principle of collateral estoppel has no application to these proceedings.
III.Breach of Contract
The defendants claim that they are entitled to summary judgment on Clermont’s claims that (a) they terminated or caused Clermont to be terminated in breach of his Employment Agreement and the Policy which gave him a right to a hearing before termination for cause and before a report to the BRM was made, and that (b) the Management Council terminated or caused Clermont to be terminated in breach of his Employment Agreement, an act beyond the scope of the Council’s authority and in violation of the Policy.
Genuine issues of material face exist here with regard to the issues of whether the Policy is a contract, see O’Brien v. New England Tel & Tel Co., 422 Mass. 686, 691 (1996) (a personnel manual may be binding on an employer), and whether Clermont was entitled to a pre-termination hearing. A review of the Employment Agreement and the Policy reveals a factual dispute exists as to whether the Policy afforded Clermont a right to a pre-termination hearing and concerning the point in the peer review process at which the Policy required the defendants to report Clermont’s termination to the BRM. Accordingly, the defendants’ motion for summary judgment on Counts IV and X is DENIED.
IV.Tortious Interference with Contractual Relations
To prevail on an intentional interference with contractual relations claim, the plaintiff must prove that: “(1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions.” Harrison v. Netcentric Corp., 433 Mass. 465, 476 (2001). This Court has found that Clermont has a viable breach of contract claim. The next issue is whether the individual defendants are indistinguishable from the corporate employer, and thus not capable of being held-liable for this cause of action.
Clearly, a corporation cannot be held liable for interference with contractual relations between itself and its employees. Appley v. Locke, 396 Mass. 540, *332 543 (1986). “Where the corporation and the individual defendant are indistinguishable,” such an individual defendant cannot be held liable for tortious interference with a contract. Harrison, 433 Mass. at 478. The defendants, relying on Legoff v. Trustees of Boston Univ., 23 F.Sup. 2d 120, 130 (D.Mass. 1998), contend that they cannot be considered third parties because, as senior employees, they are “indistinguishable” from the corporation itself. The Legoff court held that
[a] supervisor is not normally considered a third party to the contract between her subordinate and their common employer, unless the supervisor, motivated by ‘malice’ committed an intentional tort which was neither within the scope of employment nor related to the employer’s legitimate corporate interests.
Id. at 129.
Malice includes “acting with the unlawful purpose of harming the plaintiff’ as well as intentional discrimination. Id. at 130. A material dispute of fact exists as to whether the defendants were acting with an unlawful purpose of harming Clermont and, as discussed below, whether the defendants discriminated against Clermont. A material dispute of fact also remains regarding whether the defendants’ actions were within their scope of employment and related to Fallon’s legitimate corporate interests. Id. (“unlawful acts . . . including unlawful . . . discrimination, threats, and retaliation [cannot] be considered within the scope of a supervisor’s duties”).
Furthermore, to establish an improper motive, Clermont must demonstrate that the defendants acted with “actual malice,” not merely a desire for personal or financial gain. King v. Driscoll, 418 Mass. 576, 587 (1994). Because a dispute of fact exists as to actual malice on the first element of Clermont’s prima facie case, it must necessarily exist as to this element. Accordingly, the defendants’ motion for summary judgment on Count v. is DENIED.
V.Breach of Implied Covenant of Good Faith and Fair Dealing
“Every contract implies good faith and fair dealing between the parties to it.” Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471 (1991), quoting Warner Ins. Co. v. Commissioner of Ins., 406 Mass. 354, 362 n.9 (1990). The defendants maintain that no genuine dispute of fact exists to support Clermont’s contention that Fallon terminated him in bad faith. Viewing the facts in the light most favorable to the plaintiff, this Court finds that there is a genuine dispute of fact as to whether the defendants acted in bad faith in terminating Clermont. Specifically, Clerm-ont has proffered evidence that the defendants, in bad faith, made statements which exaggerated charges against him or even accused him of false charges for which they should have known were untrue. Accordingly, summary judgment on Count III is DENIED.
VI.Defamation
“Defamation is the publication of material by one without privilege to do so which ridicules or treats [one] with contempt.” Correllas v. Viveiros, 410 Mass. 314, 319 (1991). A statement is defamatory if it tends to hold the plaintiff to scorn, hatred, ridicule, or contempt in the mind of any reasonable member of the community. Stone v. Essex County Newspapers, 367 Mass. 849, 853 (1975); Sharratt v. Housing Innovations, Inc., 365 Mass. 141, 145 (1974). The plaintiff must also demonstrate that the defendant acted with negligence. Stone, 367 Mass. at 853. Publication occurs when third parties are made aware of the defamatory statement. Continental Cablevision, Inc. v. Storer Broadcasting Co., 653 F.Sup. 451, 455 (D.Mass. 1986). Oral or written communication to one person other than plaintiff satisfies the publication requirement. Brauer v. Globe Newspaper Co., 351 Mass. 53, 56 (1996). Intra-corporate communication may constitute publication. Bander v. Metropolitan Life Ins. Co., 313 Mass. 337, 348 (1943).
The defendants contend that Clermont cannot establish that any of the alleged defamatory statements were published. However, there is evidence that the defamatory statements were published because they were made to the committee members, the hearing panel, and the BRM. The defendants have a conditional privilege to “disclose defamatory information concerning an employee when publication is reasonably necessary to serve the employer’s legitimate interest in the fitness of an employee to perform his or her job” or if they acted with a reasonable belief that the defamatory statement was true. Foley v. Polaroid Corp., 400 Mass. 82, 94 (1987); Delorusso v. Monteiro, 47 Mass.App.Ct. 475, 478-9 (2001). Clermont can overcome this conditional privilege if he can establish that the defendants published the defamatory statements “recklessly” which includes “unnecessary, unreasonable or excessive publication.” Foley, 400 Mass. at 95, quoting Bratt v. International Business Machs. Corp., 392 Mass. 508, 515-16. “[A] statement made with knowledge of its falsity or with reckless disregard for the truth would be reckless within the meaning of the rule.” Id.
This Court finds that a genuine dispute of material fact exists as to whether the defendants made the defamatory statements with reckless disregard for the truth. There is evidence showing that the defendants did not look at the relevant medical charts and records when investigating the claims against him. The findings of the Hearing Panel support the conclusion that all of the charges the committees made against him, except for the informed consent charge, were false. Had the defendants simply reviewed the relevant medical charts and records, they potentially would have realized the alleged falsity of the charges. Accordingly, the defendants’ motion for summary judgment on Count I is DENIED.
VII.G.L.c. 214, §1B Privacy Act
The Massachusetts’ right of privacy statute provides that “A person shall have a right against unrea *333 sonable, substantial or serious interference with his privacy.” G.L.c. 214, §1B. In Count VI, Clermont alleges that the defendants invaded his privacy, in violation of G.L.c. 214, §1B, because they delayed in forwarding him his personal and professional mail, which had been sent to Fallon, and moreover, because they opened all of this mail. A letter to Clermont from his attorney was included in the opened mail.
“In evaluating whether an employer’s disclosure of personal information concerning an employee constitutes an unreasonable interference with the privacy right, we would balance the employer’s legitimate business interest in disseminating the information against the nature and substantiality of the intrusion.” Bratt v. International Business Machines Corp., 392 Mass. 508, 510 (1984). Clermont has alleged that because the defendants opened his mail it can be presumed that they read it. He has not, however, alleged, nor has he suggested, that the defendants disseminated any information about him to anyone. Accordingly, summary judgment on this count is ALLOWED.
In Count VII, Clermont alleges that, in violation of G.L.c. 12, §§11H and 11I and Articles 1, 10, and 12 of the Declaration of Rights, the defendants interfered with or attempted to interfere with his right to privacy and right to enjoy his life and property rights by threatening and coercing him to resign. Specifically, Clermont alleges that the defendants showed him a pre-typed resignation letter, and informed him that, if he did not resign, they would terminate him for cause and then report his termination to the BRM.
“[R]elief under [G.L.c. 12, §§11H and 111] may be granted where the ‘threat, intimidation or coercion’ involves either a physical confrontation accompanied by a threat of harm ... or the loss of a contract right ...” Willitts v. Roman Catholic Arch Bishop of Boston, 411 Mass. 202, 210 (1991); Bally v. Northeastern University, 403 Mass. 713, 719-20 (1989); Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 95 (1987). “[AJctionable coercion is ‘the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.’ ” Buster v. Moore, 438 Mass. 635, 646 (2003) (stating also that “coercion may be found where one party deprives another of rights due under a contract”). Because a material dispute of fact exists as to whether the defendants threatened Clermont with the loss of his contract with Fallon, summary judgment on Count VII is DENIED.
VIII. Breach of Fiduciary Duty
A.Count VIII
In Count VIII, it is alleged that Harding, Maini, Stoker, and Lucas, as shareholders of a closely held corporation, owed a fiduciary duly to Clermont, and that the defendants’ reasons for terminating him were pretextual, served no legitimate business purpose, and were undertaken for personal gain. The issue presented on summary judgment is whether there is a genuine issue of fact concerning whether Fallon is a closely-held corporation. Under Donahue v. Rodd Electrotype Co. of New England, 367 Mass. 578, 586 (1975),[8] Fallon does not contain the defining characteristics of a closely-held corporation because there is insufficient evidence to demonstrate substantial majority stockholder participation in the management of the corporation.
However, genuine issues of material fact exist as to whether Harding, Maini, Stoker and Lucas nevertheless violated the less stringent fiduciary duty owed to Clermont arising out of their capacity as directors or officers of Fallon.[9] “[T]he directors [or officers] of a corporation have a fiduciary duty of fair dealing with its members or shareholders in situations where corporate action is being proposed which may affect one or more shareholders adversely.” Jessie v. Boynton, 372 Mass. 293, 304 (1977). Accordingly, summary judgment on Count VIII is DENIED.
B. Count IX
In Count IX, Clermont alleges that Harding, Maini, Lucas, and Plummer, as shareholders and officers of Fallon, owed him a fiduciary duty of complete good faith, and alleges that they breached this duty by engaging in self-dealing because they terminated Clermont to enhance their ownership interest in Fallon. Clermont has failed to present sufficient evidence tending to establish a dispute of fact on this Count. The summary judgment record contains nothing more than mere allegations that the defendants engaged in self-dealing. Vague or general allegations of expected proof or mere assertions or inferences made by the opposing party are insufficient to defeat a motion for summary judgment. First Nat’l Bank of Boston v. Slade, 379 Mass. 243, 246 (1979). Accordingly, summary judgment on Count IX is ALLOWED.
C. Count XI
In Count XI, Clermont alleges that the Management Council’s reasons for terminating him were pretextual and served no legitimate business purpose. He further alleges that the members of the Council breached their fiduciary duty to him by terminating him for their personal gain. As stated above, Clermont has produced no evidence, other than mere allegations, that the defendants terminated him for personal gain.
Where there is no evidence of personal gain or self-dealing, the business judgment rule applies. Chapter 156B, §65 provides:
A director, officer or incorporator of a corporation shall perform his duties as such, including, in the case of a director, his duties as a member of a committee of the board upon which he may serve, in good faith and in a maimer he reasonably believes to be in the best interests of the corporation, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.
*334 Whether the defendants acted in good faith and in a manner they reasonably believed to be in the best interests of Fallon are questions of fact. Accordingly, summary judgment on Count XI is DENIED.
IX. Civil Conspiracy
Clermont also alleges that the defendants civilly conspired against him. To establish a claim for civil conspiracy, a Clermont must prove (1) a combination of two or more persons to accomplish an unlawful purpose, or a purpose not unlawful by unlawful means, and (2) some peculiar power of coercion of the plaintiff possessed by the defendants in combination which any individual standing in like relation to the plaintiff would not have had, and (3) damage. DesLauries v. Shea, 300 Mass. 30, 33 (1938); Cummings v. Harrington, 278 Mass. 527, 530 (1932); Carew v. Rutherford, 106 Mass. 1, 10 (1870). The defendants allege that Clermont cannot prove his civil conspiracy daim because he is alleging a civil conspiracy between the individual defendants, in their employee status, and Fallon Clinic, which must fail under Massachusetts case law holding that employees of a corporation and the corporation are incapable of entering into a civil conspiracy. This Court reads Clermont’s complaint, however, as alleging a civil conspiracy among the individual defendants. Accordingly, a genuine dispute exists regarding whether these defendants conspired to terminate Clermont, and summary judgment on Count II is DENIED.
X. Age Discrimination in Violation of G.L.c. 151B
In Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 116 (2000), the Supreme Judicial Court set forth a three-stage framework allocating the burden of proof in employment discrimination cases. In the first stage, the employee must establish his or her prima face case. Tardanico v. Aetna Life & Cas. Co., 41 Mass.App.Ct. 443, 447, review denied, 423 Mass. 1114 (1996). This requires Clermont to demonstrate that he was “(a) in a protected class, over age forty; (b) doing his job acceptably; (c) fired; and (d) replaced by a younger person.” Id. at n.4. Once the employee has successfully made out a prima facie case, the employer can rebut the presumption by articulating a nondiscriminatoiy reason for terminating the employee. Abramian, 432 Mass. at 116. In the third stage, the employee may undertake to show that the employer’s justification for the action taken against him is not genuine, but a pretext for the real and unlawful motive, Le., terminating the employee because of his age. Tardanico, 41 Mass.App.Ct. at 447.
The defendants contend that Clermont cannot establish elements (b) and (d) of his prima facie case. With regard to the evidence relating to job performance, the summaryjudgment record reflects that the Hearing Panel concluded that all of the committees’ findings were erroneous with the exception of Clermont’s failure to follow the informed consent policy. The policy, on which his termination was ultimately based, was never produced in evidence to any of the committees, including the Hearing Panel. Whether Clermont failed to meet Fallon’s legitimate job expectations is thus an issue best left for a jury to decide. As to element (d), Fallon has admitted that, after Clermont was terminated, it hired two general surgeons, one aged 37 and the other aged 38.
Although there appears to be evidence of a nondiscriminatory reason for Clermont’s termination, Le., his failure to comply with the informed consent policy, the fact that nine other reasons were not justified is evidence from which a juiy could find the articulated reasons in tota to be false.
A plaintiff may prove discrimination either by direct evidence, such as evidence that the decision-maker made statements related to the decisional process itself indicating a discriminatory motive . . ., or indirectly, by circumstantial evidence, such as evidence that the reasons the employer has articulated for its actions are false, or could not be the real reasons for the employer’s actions.
Vetresco v. Liberty Mut. Ins. Co., 55 Mass.App.Ct. 201, 206 n.2 (2002).
In Lipchitz v. Raytheon Company, 434 Mass. 493, 498 (2001), the Court held that the plaintiff had satisfied the third stage of the order of proof where she presented “sufficient evidence irom which a reasonable jury could find that at least one of Raytheon’s reasons was false...” The defendants’ motion for summaryjudgment on Count XII must be DENIED.
ORDER
For all the foregoing reasons, it is hereby ORDERED that the defendants’ motion for summaryjudgment as to Counts I, II, III, IV, V, VII, VIII, X, XI, and XII is DENIED, and as to Counts VI and IX is ALLOWED.

HCQIA was made applicable to the states. 42 U.S.C. §11111(c).

Xhe President oversees the medical and non-medical operations.

The Chief Medical Officer ensures the quality of medical care patients receive from Fallon.

Director of Risk Management.

No finding was assigned to the third case because it “did not come formally” to the Committee.

See also Singh, where the original committee did not just take the external reviewer’s report “on faith — they also reviewed several of the patient records upon which it was based prior to the vote.” 308 F.Sup. at 42.

Donahue identifies closely-held corporations as containing the following characteristics: “(1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operations of the corporation.” 367 Mass. at 586.

Maini is the President of Fallon; Lucas is an Executive Vice President of Fallon; Harding is a Vice President of Fallon; Stoker is the Director of the Division of General and Vascular Surgery. All of these individuals are also Fallon shareholders.