# United States Court of Appeals
## For the First Circuit

No. 22-1118

RICHARD GILBERT, Medical Doctor,

Plaintiff, Appellant,

v.

KENT COUNTY MEMORIAL HOSPITAL; MICHAEL DACEY, Medical Doctor, in
his individual capacity and as President of Kent Hospital,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Gelpí, Circuit Judges.

Jeffrey S. Brenner, with whom Caitlyn Smith and Nixon Peabody
LLP were on brief, for appellant.
Robert M. Duffy, with whom Eric E. Renner and Duffy & Sweeney,
LTD. were on brief, for appellees.

March 31, 2023

**LYNCH**, **Circuit Judge**.  Richard Gilbert, M.D., brought suit in federal court seeking damages and injunctive relief against Kent County Memorial Hospital (the "Hospital" or "Kent Hospital") and Michael Dacey, M.D., in his individual capacity and as President of Kent Hospital.  The suit challenges the Hospital Board of Trustees' ("Board") revocation of Dr. Gilbert's privileges at Kent Hospital.

The district court entered summary judgment in favor of Defendants, holding that Dr. Gilbert had not rebutted the presumption that Defendants are immune from liability in damages under the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 11101-11152, and that Defendants are also immune from suit under Rhode Island state law, see R.I. Gen. Laws § 23-17-23(b).  Dr. Gilbert appeals.  We affirm the judgment.

**I.**

We describe the facts giving rise to the lawsuit in a light as favorable to Dr. Gilbert as the record will reasonably allow.  See Singh v. BlueCross/BlueShield of Mass., Inc., 308 F.3d 25, 28 (1st Cir. 2002).

Dr. Gilbert has been a licensed physician in Rhode Island since December 30, 2014, specializing in gastroenterology.  In January 2015, he obtained privileges to treat patients in the Ambulatory Surgical Center at Kent Hospital, located in Warwick, Rhode Island.  On October 11, 2017, the Hospital received a written

complaint regarding Dr. Gilbert's behavior during a procedure. A staff nurse present during the procedure reported to her superiors that she saw Dr. Gilbert touch his genitals over his gown several times. She also heard him rustling his clothes while he was behind her, and she turned around to see that his hand was inside the front of his pants. The nurse, visibly upset and crying, left the room and reported what she had observed and her distress. She stated that Dr. Gilbert's behavior made her feel "uncomfortable, threatened and unsafe," and that she "d[id] not feel safe working with [Dr. Gilbert]."

This written complaint triggered an investigation, which led to Dr. Gilbert's suspension. The investigation was followed by hearings and the taking of testimony from Dr. Gilbert and others as set forth in the Kent Hospital Medical Staff Bylaws (the "Bylaws"). See Bylaws, art. X (2010). The culmination of these procedures was the Board's decision to terminate Dr. Gilbert's privileges at Kent Hospital.

### A. Kent Hospital's Bylaws Process

We briefly sketch out the process followed as to Dr. Gilbert under the Bylaws.

Kent Hospital's Bylaws process includes the following phases: (1) receipt of a complaint, (2) preliminary investigation, (3) ad hoc peer review committee review, (4) Medical Executive Committee ("MEC") review of the peer review committee's decision,

(5) Hearing Committee review, (6) MEC review of the Hearing Committee's decision, and (7) final Board review and decision. See id.

When a written complaint about the conduct of a staff member is made to the Chief Medical Officer ("CMO") or Assistant CMO, it is then forwarded to the Hospital President. Id. art. X, pt. A, § 3. Then a preliminary investigation is undertaken to determine whether to forward the complaint to the MEC for further consideration. Id. § 4(C).

If the complaint is forwarded to the MEC, the MEC chairperson appoints an ad hoc peer review committee to investigate the complaint and determine whether it has merit and, if so, appropriate disciplinary action. Id. § 5(A). The MEC reviews any disciplinary action that the peer review committee proposes. Id. § 5(B). If the recommended discipline would adversely affect the staff member's clinical privileges, the MEC must send a copy of the report to the Board and the staff member, who also must be notified of their right to request a hearing. Id. § 5(C)(2).

If the staff member requests such a hearing, the President of the Medical Staff appoints a Hearing Committee "of at least five . . . Medical Staff members, not in direct economic competition with the [staff member]." Id. art. X, pt. B, § 1. "Attendance shall be limited to the Hearing Committee, the [staff member], the involved Chief, witnesses, the officers of the Medical

Staff, representatives of the Hospital Administration, stenographer and legal counsel." Id. The hearing process affords the staff member the opportunity to make opening and closing statements, call witnesses, and present testimony and other evidence concerning any relevant matter. Id. § 2. "Within fifteen . . . working days after the hearing is closed, the Hearing Committee shall issue a written recommendation describing the conduct at issue and the sanction, if any, that is appropriate, and explaining the reason for the recommendation." Id. § 5. The staff member may then "file written objections to the recommendation, detailing the reasons why they consider the recommended findings or sanction inappropriate." Id.

The MEC reviews the "Hearing Committee's recommendation, together with any objections thereto by the [staff member] . . . , to determine whether it is appropriate in light of the record." Id. § 6. The MEC has the power to approve the Hearing Committee's recommendation or "determine that the recommended action does not properly respond to the evidence, and either increase or decrease the severity of the action." Id. The MEC shall then "promptly send a written report of its actions, which shall include an explanation of any disagreements with the recommendations of the Hearing Committee, to the Board." Id.

The Board "review[s] the [MEC's] decision, and the record of proceedings, to determine whether the [MEC's] decision

- 5 -

is sufficiently supported by the record and in accordance with Hospital policy." Id. § 7. The "Board may . . . take final action increasing or decreasing the severity of the recommended action." Id. The Board's decision is final. See id.

### B. The Investigation of Dr. Gilbert and the Resulting Board Decision

On October 11, 2017, the same day as the incident and complaint against Dr. Gilbert, then-Hospital President Dr. Dacey appointed Kelley Hewes, R.N., the Hospital's Clinical Effectiveness Manager, to investigate. That same day, Hewes interviewed the complainant, the other nurse present during the procedure, and Dr. Gilbert.

The complainant stated again that Dr. Gilbert had "rub[bed] his genitals" through his gown, and that in the past he had "scratche[d] and rub[bed] himself all over, including . . . down the front of his pants." She also reported that Dr. Gilbert, on other occasions, had made inappropriate comments to patients undergoing medication, including "You are really going to like this" and "This is for your pleasure," in a tone she described as "almost sexual" and "creepy." She said that she was "fearful of him," and that "he [was] clearly not mentally stable."

The other nurse present during the procedure confirmed that she also heard Dr. Gilbert rustling his gown and that she had, on "many" previous occasions, witnessed Dr. Gilbert put his

hands inside the front of his pants. Though she had never spoken to Dr. Gilbert directly about those observations, she told Hewes that she knew others had. She further reported that Dr. Gilbert "says inappropriate comments to patients and he is always scratching and rubbing his body." She specifically recalled that Dr. Gilbert "creep[ily]" said, "This is for your pleasure," to a medicated patient. She described Dr. Gilbert as "really odd" and said that his behavior was "disgusting" and "ma[de] everyone feel uncomfortable."

When Hewes interviewed Dr. Gilbert, he flatly denied the allegations. She asked if he had a "nervous tic[] or a chronic genital itch," and he responded, "[N]o, that is absolutely absurd." Only later in the Bylaws process did Dr. Gilbert claim that he suffers from a "chronic skin condition" that could explain his behavior.

The next day, October 12, Hewes individually interviewed three staff members in the Ambulatory Surgical Center, whose observations of Dr. Gilbert's actions were consistent with the nurse's complaint. These staff members reported Dr. Gilbert's "hand gestures to be offensive and inappropriate," that they had witnessed his "hands go down the front of his pants," and that they "fe[lt] uncomfortable and unsafe and d[id] not want to work with Dr. Gilbert." During her investigation, Hewes learned a second complaint had been made against Dr. Gilbert six weeks

earlier by a different nurse, which described Dr. Gilbert placing his hands inside the front of his pants during an endoscopic procedure, but the complaint had not been investigated.

On October 13, 2017, after receiving Hewes's three-page investigative report, Dr. Dacey placed Dr. Gilbert on administrative leave pending investigation. See Bylaws, art. X, pt. A, § 7(A). Dr. Dacey placed conditions on Dr. Gilbert's administrative leave, which the latter agreed to, including that Dr. Gilbert (1) was to attend the Rhode Island Medical Society's Physician Health Program ("PHP") for evaluation and treatment and (2) depending on the outcome of the PHP evaluation, was to obtain a proctor to monitor his professional activity, and (3) was not to enter restricted areas of the Hospital. But according to Dr. Dacey, Dr. Gilbert expressed "reluctance to follow through with the PHP evaluation" and had "access[ed] and [was present] in restricted areas of the Hospital."[1] Dr. Dacey informed Dr. Gilbert that his privileges were now suspended without condition, citing concerns of patient safety and orderly running of the Hospital.

The complaint against Dr. Gilbert was then referred to an ad hoc peer review committee of the MEC. See id. §§ 4-5. The peer review committee obtained Hewes's report and questioned Dr.

---

[1] According to the Hearing Committee Report, Dr. Gilbert also was seen sitting in his car in the Hospital's parking lot for extended periods of time, which staff members reported made them feel uncomfortable.

Dacey on the matter. The committee decided, with MEC approval, to continue the suspension of Dr. Gilbert's privileges without modification. The peer review committee, in a letter dated November 8, 2017, informed Dr. Gilbert of its decision, explaining it was due to his "unprofessional conduct," and of his "right to request a hearing under part B of [Article X] of the hospital bylaws."

Dr. Gilbert requested such a hearing before a Hearing Committee, which consisted of five physicians who were not in direct competition with him. The Hearing Committee commenced its review in January 2018. Both Dr. Gilbert and Kent Hospital were represented by counsel before the Hearing Committee. Dr. Dacey and Hewes testified on the Hospital's behalf, and Dr. Gilbert testified on his own behalf, with the assistance of his counsel, and introduced seven exhibits. The Hearing Committee issued its fifteen-page Decision and Recommendation on May 11, 2018. The Hearing Committee found that Dr. Gilbert's conduct "impacted the orderly running of the Hospital and was otherwise disruptive," that Dr. Gilbert was not a credible witness, and that Dr. Gilbert had failed to comply with the conditions Dr. Dacey imposed on the initial suspension of his privileges. The Hearing Committee recommended "corrective action in the form of a 29-day suspension" on the condition that Dr. Gilbert not resume privileges at Kent Hospital without complying with the conditions Dr. Dacey had

previously imposed, i.e., he must "conclude the evaluation per PHP mandates and [obtain] an approved proctor for ten clinical procedures." The MEC voted to approve the Hearing Committee's recommendation, which was then forwarded to the Board for final review and action.

At a meeting on June 28, 2018, the Board addressed the investigation of Dr. Gilbert and his status. The Board had previously been presented with the investigation at its May 2018 meeting. The Board had before it the Hearing Committee's recommendation and heard presentations from Dr. Jason Boudjouk, a director of the Board, as to the facts of the matter, and Dr. Raymond Powrie as to the MEC review. According to the minutes, Board members were concerned about Dr. Gilbert continuing on at the Hospital, and Board members stressed that he had failed to comply with the conditions that Dr. Dacey imposed on the initial suspension, including complying with the PHP mandates. Board members were further concerned about the need to report Dr. Gilbert's actions in order not to "kick the can down the road" and put future patients at risk at other institutions. The Board voted to revoke Dr. Gilbert's privileges.[2]  See id. Part B, § 7

---

[2]    Because Dr. Gilbert's suspension exceeded thirty days, the Hospital was required by law to report the adverse action to the National Practitioner Data Bank and the Rhode Island Board of Medical Licensure and Discipline ("RIBMLD").  See 42 U.S.C. §§ 11133(a)(1)(A), 11134; R.I. Gen. Laws § 5-37-9(ii).

- 10 -

(empowering the Board to review the MEC decision and "take final action increasing or decreasing the severity of the recommended action").

## II.

On September 13, 2018, Dr. Gilbert sued Kent Hospital and Dr. Dacey on "the grounds that the Board improperly revoked his privileges with Kent Hospital." Gilbert v. Kent Cnty. Mem'l Hosp., No. 18-cv-00510, slip op. at 7 (D.R.I. Jan. 3, 2022). Dr. Gilbert brought a number of state law claims against Kent Hospital and Dr. Dacey for violations of the Bylaws and due process, breach of good faith and fair dealing (breach of contract), defamation, and violation of the Rhode Island Civil Rights Act for perceived disability discrimination. He sought damages and declaratory and

---

Because the Hospital had previously notified RIBMLD of Dr. Gilbert's initial suspension, RIBMLD had been conducting a parallel investigation of Dr. Gilbert's conduct. It publicly issued a consent order finding that Dr. Gilbert

> acted in a manner which created a disruptive environment in a clinical setting and displayed conduct that was considered offensive and therefore committed . . . [i]ncompentent, negligent, or willful misconduct in the practice of medicine which includes the rendering of medically unnecessary services, and any departure from, or the failure to conform to, the minimal standards of acceptable and prevailing medical practice in his or her area of expertise as is determined by the [B]oard

(emphasis in original) (quoting R.I. Gen. Laws § 5-37-5.1). RIBMLD ratified its findings on January 9, 2019.

- 11 -

equitable relief. After pretrial discovery, Dr. Gilbert filed a motion for partial summary judgment on his claims for declaratory and equitable relief, and Kent Hospital and Dr. Dacey cross-moved for summary judgment on all counts. The district court granted summary judgment for Kent Hospital and Dr. Dacey, holding that they were immune from liability in damages under the HCQIA because, on the undisputed facts, the peer review process satisfied the statute's requirements. See id. at 12. As to all Dr. Gilbert's claims, the district court found Kent Hospital and Dr. Dacey immune under Rhode Island state law because, on the undisputed facts, the Hospital's actions were taken in good faith pursuant to the Bylaws. See id. at 13 (citing R.I. Gen. Laws § 23-17-23(b)).

### A. The Board Is Entitled to HCQIA Immunity

Congress passed the HCQIA in 1986 due to the "national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 11101(2); see Singh, 308 F.3d at 31 ("Congress passed the HCQIA . . . [to] respond[] to a crisis in the monitoring of health care professionals."); Bryan v. James E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1321 (11th Cir. 1994) ("Congress enacted the [HCQIA] . . . 'to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior.'" (quoting

- 12 -

H.R. Rep. No. 99-903, at 2 (1986))). Congress found that the problem could be "remedied through effective professional peer review," but the "[t]hreat of private money damage liability . . . unreasonably discourage[d] physicians from participating in effective professional peer review." 42 U.S.C § 11101(3)-(4). Recognizing the "overriding national need to provide incentive and protection for physicians engaging in effective professional peer review," id. § 11101(5), Congress enacted the HCQIA to immunize from liability for damages any professional review body[3] that performs, pursuant to statutory requirements, a professional review action,[4] id. § 11111(a)(1). HCQIA immunity extends to "any person acting as a member or staff to the [professional review]

---

[3]    The HCQIA defines a "professional review body" as "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, . . . includ[ing] any committee of the medical staff of such an entity when assisting the governing body in a professional review activity." 42 U.S.C. § 11151(11).

[4]    The HCQIA defines a "professional review action" as

an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.

42 U.S.C. § 11151(9).

body," "any person under a contract or other formal agreement with the body," and "any person who participates with or assists the body with respect to the action." Id. § 11111(a)(1)(B)-(D). Here, the parties do not dispute that Kent Hospital's MEC, Hearing Committee, and Board constitute professional review bodies under the HCQIA, and that the Hospital's review of Dr. Gilbert's conduct constitutes a professional review action under the HCQIA.

The HCQIA requires that a professional review action meet four conditions for the professional review body to obtain immunity from liability in damages under the HCQIA. See id. § 11112(a). The action must be taken (1) "in the reasonable belief that the action was in the furtherance of quality health care," (2) "after a reasonable effort to obtain the facts of the matter," (3) "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances," and (4) "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)." Id. As stated in the legislative history, the HCQIA standards "will be satisfied if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect

patients."   H.R. Rep. No. 99-903, at 10 (discussing the proper test to use in applying the first HCQIA standard).

On appeal, Dr. Gilbert argues that the district court erred because a reasonable jury could find that he had rebutted the presumption of immunity under the fourth prong.

We review the district court's entry of summary judgment de novo.  Singh, 308 F.3d at 31.  "[A] professional review action shall be presumed to have met the [HCQIA] standards . . . unless the presumption is rebutted by a preponderance of the evidence." Id. at 32 (omission in original) (quoting 42 U.S.C. § 11112(a)). "The [HCQIA] test is an objective one, so bad faith is immaterial. The real issue is the sufficiency of the basis for the [Hospital's] actions."  Id. (second alteration in original) (quoting Bryan, 33 F.3d at 1335).  In considering Defendants' motion for summary judgment based on HCQIA immunity, we ask whether "a reasonable jury, viewing the facts in the best light for [Dr. Gilbert], [could] conclude that he has shown, by a preponderance of the evidence, that . . . [D]efendants' actions are outside the scope of [42 U.S.C.] § 11112(a)."  Id. (quoting Austin v. McNamara, 979 F.2d 728, 734 (9th Cir. 1992)).  Dr. Gilbert "can overcome HCQIA immunity at the summary judgment stage only if he demonstrates that a reasonable jury could find that . . . [D]efendants did not

conduct the relevant peer review actions in accordance with one of the HCQIA standards."  Id.

The Hospital contends that it revoked Dr. Gilbert's privileges to protect patients both at Kent Hospital and "at other institutions."  Dr. Gilbert contends that the Board's revocation of his privileges at Kent Hospital was not taken "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts."  42 U.S.C. § 11112(a)(4). According to Dr. Gilbert, "the facts known" at the time of his revocation were that: (1) there was no "evidence to support a finding that there was a threat to patient safety," (2) he "had no intention of ever resuming his clinical practice at Kent Hospital," and (3) he "was unconscious of his behavior and lacked awareness of how his physical, chronic condition manifested itself in a work setting amongst his colleagues."  However, the Board had significantly more information before it than Dr. Gilbert describes, and none of these arguments have merit.

As to Dr. Gilbert's first claim, Dr. Dacey explained that Dr. Gilbert's privileges were initially suspended "over concerns of patient safety and orderly running of the hospital" (emphasis added).  Although the MEC subsequently determined that "Dr. Dacey was justified in issuing an immediate suspension and to continue that suspension until such time as Dr. Gilbert was evaluated by the PHP," it "d[id] not believe there [was] evidence

- 16 -

to support a finding that there was a threat to patient safety." That the Board disagreed with the MEC's conditional recommendation -- and agreed, instead, with Dr. Dacey's initial take -- does not make the Board's decision unreasonable. The Board considered that the MEC recognized that Dr. Gilbert had impeded the orderly running of the Hospital and also that his conduct was otherwise disruptive. The Board had before it for consideration the Hearing Committee Report, which found that Dr. Gilbert's testimony often was not credible. And the Hearing Committee found that Dr. Gilbert was aware of the three conditions to be observed during his initial suspension and violated those conditions. Each of those conditions was meant to protect patient safety. The record was replete with evidence that Dr. Gilbert had engaged in offensive behavior, upsetting nurses during procedures on patients more than once. The record does not permit the conclusion that the Board insufficiently reviewed the matter before reaching its decision. The Board received a presentation on Dr. Gilbert's matter at a previous Board meeting. It reviewed the Hearing Committee's Decision and Recommendation, which included numerous examples of Dr. Gilbert disrupting Hospital operations, deviating from the standards applicable to Hospital staff, behaving offensively, and violating the terms of his suspension and the Code of Conduct. The Board listened to presentations by Dr. Boudjouk, a director of the Board, as to the facts and chronology of the matter, and by

Dr. Powrie, then interim president of Kent Hospital, as to the MEC's review of the Hearing Committee's Decision and Recommendation. The Board discussed Dr. Gilbert's actions, his failure to pursue the required psychological evaluation, and the Board's need to protect patients and thus not evade reporting to the National Practitioner Data Bank by instituting a suspension less than thirty days. Dr. Gilbert can point to nothing that indicates the Board's conclusion was based on anything but a reasonable belief that the facts justified the action. The issue under HCQIA immunity is whether he has met his burden to overcome the presumption of immunity. Dr. Gilbert has not.

Dr. Gilbert's second argument is similarly misfocused. Dr. Gilbert relies on his own testimony before the Hearing Committee that "he ha[d] no intention of ever resuming his clinical practice at the Hospital." However, the Board was not required to base its decision on Dr. Gilbert's self-serving statement, especially in light of the Hearing Committee's determination that Dr. Gilbert's testimony was "at times incomprehensible, incredible, and non-sensible," "not believable," "extremely evasive," or otherwise did "not square with the probative evidence." Moreover, the Board was clear that it was also concerned with "the need to report the action to prevent Dr. Gilbert from putting other patients at risk at other institutions." In any event, the issue is not whether Dr. Gilbert would eschew

- 18 -

seeking privileges at Kent Hospital again after the investigation. Whether he would or not, the Board reasonably understood that he might well seek hospital privileges elsewhere. The Board's decision was reasonable because its disciplinary action ensures prospective hospital employers will learn of Dr. Gilbert's past conduct. Congress enacted the HCQIA in large part to prevent evasion of reporting a disciplinary action to a future hospital employer. See 42 U.S.C. § 11101(2).

Dr. Gilbert's third argument, based on his alleged unconsciousness of his behavior, is similarly misfocused and also fails for a number of reasons. The immunity test has no exception to immunity for claims that the doctor was not conscious of his actions. See 42 U.S.C. §§ 11111(a), 11112(a). The HCQIA is focused on "protect[ing] patients" and furthering quality healthcare irrespective of the state of mind of the subject of a review action. Singh, 308 F.3d at 32 (quoting H.R. Rep. No. 99-903, at 10). Moreover, the Hospital was not unreasonable in rejecting such an excuse. As noted above, the Hearing Committee found that Dr. Gilbert's testimony at times was not credible or was incomprehensible, and he could not explain his belated excuse for his behaviors. The Hearing Committee reasonably concluded that Dr. Gilbert was "at times [an] incomprehensible [and] incredible" witness, so Dr. Gilbert's assertion that he was unconscious of his behavior should be met with skepticism. Even

- 19 -

so, the Hearing Committee did take seriously Dr. Gilbert's assertion of unconsciousness. That too supports the Board's reasonable decision that Dr. Gilbert's privileges should be revoked because of the risk to patient safety. And, of course, Dr. Gilbert's failure to comply with the three conditions can hardly be said to be unconscious. Furthermore, the Hospital's investigation confirms that Dr. Gilbert's conduct on October 11, 2017, was part of a pattern of behavior, which had been brought to his attention before.

Regardless of whether the Hospital complied with its Bylaws, which it appears to have done, compliance with bylaws is not the statutory test. See Poliner v. Tex. Health Sys., 537 F.3d 368, 378 (5th Cir. 2008) ("[F]or the purposes of HCQIA immunity . . . what we consider is whether these 'peer review actions' satisfy the HCQIA's standards, and not whether the [challenged actions] satisfy the bylaws.").

Dr. Gilbert has failed to "demonstrate that a reasonable jury could find that [Kent Hospital] could not have 'concluded that [its] action would restrict incompetent behavior or would protect patients.'" Singh, 308 F.3d at 41 (second alteration in original) (quoting Egan v. Athol Mem'l Hosp., 971 F. Supp. 37, 42 (D. Mass. 1997), aff'd per curiam, 134 F.3d 361 (1st Cir. 1998) (unpublished table decision)). Kent Hospital is thus immune under the HCQIA. That disposes of Dr. Gilbert's claim for damages on

- 20 -

all but his cause of action under the Rhode Island Civil Rights Act. See 42 U.S.C. § 11111(a)(1) (providing that the HCQIA "shall not apply to damages under any law of the United States or any State relating to the civil rights of any person or persons").

**B. The Board Is Entitled to Immunity Under R.I. Gen. Laws § 23-17-23(b)**

Immunity under Rhode Island General Laws § 23-17-23(b) is broader than federal immunity, extending to all causes of action of any nature arising from hospital disciplinary actions undertaken for good cause and in good faith. Because HCQIA immunity covers only liability for damages and Dr. Gilbert also seeks declaratory and equitable relief, we review de novo the district court's summary judgment determination that Kent Hospital and Dr. Dacey are immune under Rhode Island state law. See Singh, 308 F.3d at 31; see also Cohlmia v. St. John Med. Ctr., 693 F.3d 1269, 1279 (10th Cir. 2012) (explaining that "HCQIA grants immunity only against . . . monetary damage award[s]").

R.I. Gen. Laws § 23-17-23(b) provides that "[t]here shall be no liability on the part of and no cause of action of any nature shall arise against any hospital, hospital board of trustees, or any hospital medical staff committee, where instituted by hospital by-laws, for any action taken in good faith in carrying out" the authorization in § 23-17-23(a). Rhode Island General Laws § 23-17-23(a) provides that the "board of trustees of

- 21 -

a hospital or other appropriate authority licensed pursuant to the laws of the state is authorized to suspend, deny, revoke, or curtail the staff privileges of any staff member for good cause . . . for unprofessional conduct."  See also id. § 5-37-5.1 (providing unexhaustive listing of unprofessional conduct amounting to good cause under § 23-17-23(a)).  Dr. Gilbert argues that the Board acted in bad faith and that there is "a genuine issue of material fact regarding whether the Board had good cause for the revocation of [his] privileges."  Again, we disagree.  On the undisputed material facts, the Board's decision was taken in good faith and for good cause.

Dr. Gilbert points to no evidence in the record that would lead a reasonable jury to conclude that the Board acted in bad faith.  He merely advances an argument in his brief that the "Board did not act with an honest intention to ascertain the facts in this matter," and "one reasonable inference drawn from the record is that the Board could not have had an honest belief that revoking [his] privileges would advance patient safety."  We have already disposed of this argument.  See supra Section II.A.

The Board had good cause for the revocation of Dr. Gilbert's privileges.  Dr. Gilbert argues that there was no good cause for the Board's revocation of his privileges because his conduct does not fall within one of Rhode Island state law's enumerated grounds for good cause revocation.  See R.I. Gen. Laws

- 22 -

§ 5-37-5.1.  But the list of grounds that Dr. Gilbert references is not exhaustive, so his conduct does not need to fall within one of the enumerated grounds to satisfy the state law good-cause requirement.  See id. (providing that set of relevant grounds, "includes, but is not limited to," the listed items); id. § 23-17-23(a) ("[G]ood cause . . . shall include the grounds specified in § 5-37-5.1 for unprofessional conduct." (emphasis added)).  Again, for reasons already explained, the Hospital had good cause to revoke Dr. Gilbert's privileges.

### C. Dr. Gilbert's Claims Against Dr. Dacey

Because Dr. Dacey was a member of the staff of Kent Hospital during part of the investigation into Dr. Gilbert and took part in the review process, see supra Section I.B, he shares the Hospital's immunity under federal law.  See 42 U.S.C. § 11111(a)(1)(B), (D) (immunizing from liability "any person acting as a member or staff to [a] [professional review] body" and "any person who participates with or assists the body with respect to the action").  Citing R.I. Gen. Laws § 23-17-23(b), Defendants contend that Dr. Dacey also shares the Hospital's immunity under state law in both his individual and official capacities.  Dr. Gilbert contends only that he "has put forth evidence that Defendants are not entitled to state law immunity."  But, as explained above, we disagree with Dr. Gilbert on that score and conclude that the Hospital is entitled to state law immunity.

- 23 -

Because Dr. Gilbert does not argue that Dr. Dacey's immunity status is or should be different from the Hospital's, he has waived any argument as to Dr. Dacey's immunity under R.I. Gen. Laws § 23-17-23(b).  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

## III.

For the foregoing reasons, the district court's judgment is **affirmed**.  Costs are awarded to Kent Hospital and Dr. Dacey.